**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Bison Advisors LLC, a Minnesota limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. |
| | ) |
| Irvin Kessler, Peter Goddard and Walleye Trading Advisors LLC, a Minnesota limited liability company, | ) ) **JURY TRIAL DEMANDED ON** ) **ALL ISSUES TRIABLE TO A** ) **JURY** |
| Defendants. | ) |

**BISON ADVISORS LLC'S COMPLAINT AGAINST IRVIN KESSLER, PETER GODDARD, AND WALLEYE TRADING ADVISORS LLC**

Plaintiff, Bison Advisors LLC, for its Complaint against Defendants Irvin Kessler, Peter Goddard, and Walleye Trading Advisors LLC, states:

**Parties**

1.      Plaintiff Bison Advisors LLC ("Bison") is a limited liability company organized under the laws of the State of Minnesota with its principal place of business located at 10074 West 190th Place, Mokena, Illinois.  (Exhibit 1, Bison Operating Agreement, ¶ 2.6).  Bison's current members are Argos Capital Management Inc. ("Argos"), a Delaware Chapter S Corporation whose principal place of business is 1280 South Ute Avenue, Aspen, Colorado, and Kevin Murphy, a citizen and resident of Illinois.

2.      Defendant Irvin Kessler ("Kessler") is a citizen and resident of the State of Minnesota.

3.      Defendant Peter Goddard ("Goddard") is a citizen and resident of the State of Minnesota.

1

4.    Defendant Walleye Trading Advisors LLC ("Walleye") is a limited liability company organized under the laws of the State of Minnesota with its principal place of business located in the State of Minnesota.  Walleye's sole members are Goddard, Kessler, Christopher A. Welty, a citizen and resident of the State of New York, Mark Lyons, a citizen and resident of Minneapolis, Minnesota, and Ori Kushnir, a citizen and resident of Japan.

### Jurisdiction and Venue

5.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity as between the parties and their members.

6.    Personal jurisdiction by this Court over Defendants Goddard, Kessler, and Walleye is proper because each defendant is a Minnesota citizen and resident.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in this district, a substantial part of the property that is the subject of this action is situated in this district, and each defendant is a Minnesota citizen and resident.

8.    Personal jurisdiction and venue is also proper because the parties agreed to have their dispute adjudicated in Minnesota and submitted to the venue and jurisdiction of this Court. Exhibit 1 at ¶ 10.4.

### Summary of Claims

9. Bison, an equity and commodity trading firm, required all of its members including Kessler and Goddard (who were Bison members until September 2013) to sign a Noncompete Covenant so as to establish an easily enforceable bright line between what the

2

members of Bison could and could not do outside of Bison while they were affiliated with Bison and for a period of two years thereafter.  (Exhibit 1 at ¶ 6.4).

10.    The Noncompete Covenant prohibited Bison's member from engaging in any trading strategy having greater than a 25% daily turnover except when Axiom Investment Advisors LLC ("Axiom") was trading "currencies" and when Walleye was trading "options and delta hedging strategies for options."  (Exhibit 1 at ¶ 6.4).  The Noncompete Covenant further provides that if any member withdraws from Bison, the member is still bound by the terms of the Noncompete Covenant for two years after their withdrawal.  (Id.)

11.    Recently, Bison discovered that Kessler, Goddard and Walleye (a business run by Kessler and Goddard) have been secretly and continuously utilizing, since at least as early as mid-2013, a equity trading strategy (which was neither options nor delta hedging strategies for options) outside of Bison with a greater than 25% daily turnover and not sharing the profits with Bison—precisely the situation sought to be foreclosed upon by the Noncompete Covenant. Worse, Kessler, Goddard and Walleye misappropriated Bison's proprietary information in the implementation of the prohibited trading strategy.

12.    This suit seeks injunctive relief to enforce the terms of the Noncompete Covenant. The suit further seeks in excess of $10 million, which includes a constructive trust on all of the profits that Kessler, Goddard, and Walleye have obtained as a result of the breach of the Noncompete Covenant plus (to the extent it is not inconsistent with the remedy of a constructive trust), Bison's lost profits stemming from Kessler, Goddard and Walleye's breach of the Noncompete Covenant.

### Background

13.    Bison's initial Class A members were: (1) Irvin Kessler; (2) Peter Goddard; (3) Ephi Gildor; (4) Kevin Murphy; (5) Chris Murphy; and (6) Lingling Wu, who were collectively entitled to 20% of Bison's profits.  (Exhibit 1 at ¶ 4.1 (a)).  Bison's initial Class B members were: (1) Ori Kushnir; (2) Axiom; (3) Irvin Kessler; (4) Peter Goddard; and (5) Mark Lyons, who were collectively entitled to 80% of Bison's profits.  (Id.)

14.    To establish an easily enforceable bright line between what the members of Bison could and could not do outside of Bison while they were affiliated with Bison and for a period of two years thereafter, Bison required its members (including Kessler and Goddard) to sign a covenant not to compete.  Paragraph 6.4 of Bison's LLC Agreement provides:

Noncompete

  (a)    During the period of time that any Person is a Member of the Company and for two (2) years after the date of withdrawal or removal of a Member, such Person will not directly or indirectly as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity:

  (i)    engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which trades or plans on trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more. Specifically currencies are excluded for Axiom and partners associated with Axiom, and options and delta hedging strategies for options are excluded for Walleye and partners associated with Walleye.

(referred to as the "Noncompete Covenant").  Exhibit 1.

15.    In mid-2013, Mr. Gildor decided to shut down Axiom, a previously successful business he had run.  One of the reasons Mr. Gildor decided to shut down Axiom was so that he could work more closely with Kessler, whom Mr. Gildor had known for decades, and in whom Mr. Gildor placed great trust and confidence.

16.    Unbeknownst to Mr. Gildor and Bison, at approximately the same time (if not earlier), Kessler, Goddard, and Walleye were preparing to breach the Noncompete Covenant,

their fiduciary duties, aid and abet a fiduciary breach, defraud Bison, tortiously interfere with Bison, and misappropriate Bison's trade secrets.

17.    In mid-2013 if not earlier, Kessler and Goddard, through defendant Walleye, began engaging in equity trading strategies that had "an average daily turnover of [in excess of] 25 percent" in clear violation of the Noncompete Covenant.  (Exhibit 1 at ¶ 6.4).  Indeed, by the middle of 2013, Walleye's average daily turnover was roughly 50% and its trading strategies were not permitted options or delta hedging strategies for options.

18.    The contractual prohibition against engaging in trading strategies that have a daily turnover of 25 percent or more continues for two years after a member of Bison withdraws. (Exhibit 1 at ¶ 6.4).

19.    Prior to spring 2014, Bison was unaware that Kessler, Goddard, and Walleye were engaged in pairs trading that both violated the Noncompete Covenant.  (Exhibit 1 at ¶ 6.4). In June 2014, it became clear that Kessler, Goddard and Walleye were engaged in pairs trading that violated the Noncompete Covenant based on an analysis of the strategy's turnover.  Pairs trading strategies track the prices of two historically correlated equities.  When equities diverge, a pairs trader buys the equity whose price has lagged and sells the equity whose price has risen, thus betting that the historical correlation will return.  Successful pairs trading requires optimal position sizing, and market timing.

20.    In the Spring of 2014, Bison determined that Walleye, since at least mid 2013, had been (1) using an exponential moving average ("EMA") pairs trading model that was very similar to the trading framework used by Bison with similar parameters to Bison's model; and (2) using a price ratio based parallelogram as a means to trade more systematically, which is what Bison had been doing.

21.    Walleye was able to acquire Bison's information, technology and trade secrets through Goddard and Kessler's membership in Bison.  In particular, Goddard gained such information through discussions and emails with Lingling Wu, Chris Murphy, and Kevin Murphy.  At the time of these discussions, Lingling Wu, Chris Murphy, and Kevin Murphy were unaware that the information would be used for the purpose of running a competing pairs trading business.

22.    At a meeting in Mokena, Illinois on June 18, 2014 at Bison's office, Kessler admitted to Mr. Gildor and Kevin Murphy that Walleye does, in fact, engage in trading strategies that have a daily turnover of 25 percent or more.

23.    Kessler and Goddard, as members of Bison, owed Bison fiduciary duties.

24.    Prior to August 2013, Kessler and Goddard breached their fiduciary duties to Bison because, while still members of Bison, they engaged in equity trading strategies that had an average daily turnover of in excess of 25 percent in violation of the Noncompete Covenant, and failed to disclose that they were operating a competing business, Walleye, that utilized a pairs trading model that mirrored the model developed and utilized by Bison.

25.    On or about August 28, 2013, Kessler and Goddard withdrew from Bison.

26.    At the time they withdrew, Kessler and Goddard did not inform Bison that: (1) they had been violating the Noncompete Covenant; (2) they (through Walleye) had been using Bison's information, technology and trade secrets; and (3) they intended to continue their misconduct.

27.    In or about late August 2013, as a result of Goddard, Kessler, and Walleye's fraudulent omissions, Bison, Walleye and others entered into a complicated profit and salary

6

sharing agreement ("the September 2013 Agreement").  Pursuant to the September 2013 Agreement, as of July 2013:

- 49.6% of Bison's profits would go to Walleye;

- 50.4% of Bison's profits would go to Chris Murphy, Lingling Wu and Bison (which, pursuant to the September 2013 Agreement, was owned by Argos and Kevin Murphy);

- Chris Murphy's (6.624% of profits) and Lingling Wu's (6.624% of profits) were to be paid through Walleye; and

- Kevin Murphy, Chris Murphy, Lingling Wu, Mr. Gildor, Defendant Kessler, and Defendant Goddard were to be the team, going forward, that was to operate to make Bison successful.

28.     The September 2013 Agreement permitted Goddard (from August 2013 forward) to have access to Bison's information, technology, and trade secrets in order to effectuate Walleye's assistance with the continued improvement of Bison's pairs trading operation, for which assistance Walleye was to be compensated pursuant to the terms of the September 2013 Agreement.

29.     Since at least September 2013, Walleye has wrongfully used Bison's information, technology and trade secrets in its business, which competes with Bison.  As late as June 2014, Ephi Gildor, Chris Murphy, Lingling Wu, and Kevin Murphy were working with Will England of Walleye to improve the Bison pairs trading model, without knowledge that Walleye was violating the Noncompete Covenant and thus competing with Bison.

30.     If Bison had known Kessler, Goddard, and Walleye were violating the Noncompete Covenant prior to August 2013 (or at any other time), Bison would not have entered

7

into any agreements with Kessler, Goddard or Walleye which would have permitted them to have any access to Bison's information, technology, or trade secrets.

31.     Bison is not required to unwind the September 2013 Agreement and it would be impossible to do so.  Alternatively, to the extent it is required and possible to do so, Bison is prepared to unwind the September 2013 Agreement and return whatever benefits it has received pursuant to the September 2013 Agreement.

32.     Bison is entitled to a constructive trust on all profits earned by Kessler, Goddard, and Walleye as a result of their fraud, breaches of fiduciary duty, and breaches of the Noncompete Covenant contained in the Bison Operating Agreement.

33.     Bison is entitled to an injunction prohibiting Kessler, Goddard, and Walleye from violating the Noncompete Covenant contained in the Bison Operating Agreement and breaching their fiduciary duties.  Indeed, Kessler and Goddard formally "waiv[ed] the claim or defense that [Bison] has an adequate remedy at law."  (Exhibit 1 at ¶ 10.12).

## COUNT I
### (Breach of Noncompete Covenant against all Defendants)

1-33.   As paragraphs 1 through 33 of Count I, Bison incorporates by reference Paragraphs 1-33 above.

34.     Kessler and Goddard are signatories to the Bison Operating Agreement, which was supported by valid consideration, and are bound by its terms.  Exhibit 1.

35.     The Noncompete Covenant is reasonable and necessary to protect Bison's legitimate business interest and prevents Kessler and Goddard from having "an interest in or become associated with any entity, firm, business, activity or enterprise which trades or plans on trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more."  (Exhibit 1 at ¶ 6.4).

36. Kessler and Goddard have breached the Noncompete Covenant contained in the Bison Operating Agreement because Walleye's pairs trading strategy has an average daily turnover of 25 percent or more.

37. Because Kessler and Goddard used Walleye, an entity they own and control, as an instrumentality to breach the Noncompete Covenant, Walleye is also liable for the contractual breach.

38. Bison has fully performed all of its obligations under the Bison Operating Agreement.

39. Bison has been damaged as a result of the breach of the Noncompete Covenant, including by having its information, technology, and trade secrets misappropriated.

Wherefore, Bison requests entry of a judgment in its favor and against Kessler, Goddard, and Walleye awarding Bison:

(1) its damages, which are in excess of $75,000, and which include all of the profits that Kessler, Goddard, and Walleye have obtained as a result of the breach of Noncompete Covenant, and Bison's lost profits;

(2) a preliminary and permanent injunction barring further violation of the Noncompete Covenant; and

(3) all other relief that the Court deems just and proper.

## COUNT II
**(Breach of Duty of Loyalty/Breach of Fiduciary Duty against Goddard and Kessler)**

1-39. As paragraphs 1 through 39 of Count II, Bison incorporates by reference Paragraphs 1-39 of Count I.

40. As members of Bison from 2010 to September 2013, Kessler and Goddard owed Bison fiduciary duties and duties of loyalty.

41.   Kessler and Goddard breached their fiduciary duties and duties of loyalty to Bison by: (1) violating the Noncompete Covenant and by failing to disclose such fact to Bison; (2) running a competing business in violation of the Noncompete Covenant; (3) misusing Bison's information, technology and trade secrets for the benefit of their competing business; and (4) entering into agreements with Bison and affiliated persons at the time they withdrew from Bison, for the purpose and with the intent to wrongfully disadvantage Bison, without disclosing their conflict of interest in entering into these agreements.

42.   As a result of Goddard and Kessler's breaches of their fiduciary duties and duties of loyalty to Bison, Bison has suffered damages, including that: (1) its information, technology, and trade secrets have been used by a competitor; (2) Bison has effectively funded the start-up costs of a competitor; and (3) Bison entered into the September 2013 Agreement which permitted Walleye, Goddard, and Kessler to continue to have access to Bison's information, technology and trade secrets after Goddard and Kessler withdrew from Bison, which Bison would not have done had it known the true facts.

Wherefore, Bison requests entry of a judgment in its favor and against Kessler and Goddard, awarding Bison:

(1) its damages, which are in excess of $75,000, and which include all of the profits that Kessler, Goddard, and Walleye have obtained as a result of the breaches of fiduciary duty and breaches of duty of loyalty, and Bison's lost profits;

(2) a preliminary and permanent injunction barring further violation of the Noncompete Covenant; and

(3) all other relief that the Court deems just and proper.

## COUNT III
### (Aiding and Abetting a Breach of Fiduciary Duty against Walleye)

42.     As paragraphs 1 through 42 of Count III, Bison incorporates by reference Paragraphs 1-42 of Count II.

43.     At all relevant times, Walleye was owned and controlled by Kessler and Goddard and accordingly, Walleye was fully aware of Kessler and Goddard's fiduciary breaches.

44.     Walleye substantially assisted Kessler and Goddard in committing their fiduciary breaches as Walleye was the entity through whom Kessler and Goddard were operating when they violated the Noncompete Covenant and through which Kessler and Goddard implemented a trading strategy that improperly utilized Bison's information, technology, and trade secrets.

Wherefore, Bison requests entry of a judgment in its favor and against Walleye, awarding Bison:

(1) its damages, which are in excess of $75,000, and which include all of the profits that Kessler, Goddard, and Walleye have obtained as a result of Kessler, Goddard, and Walleye's misconduct, and Bison's lost profits;

(2) a preliminary and permanent injunction barring further violation of the Noncompete Covenant; and

(3) all other relief that the Court deems just and proper

## COUNT IV
### (Fraud against Kessler and Goddard)

1-44.   As paragraphs 1 through 44 of Count IV, Bison incorporates by reference Paragraphs 1-44 of Count III.

45.     As members of Bison from 2010 to September 2013, Kessler and Goddard owed Bison fiduciary duties.

11

46.     Kessler and Goddard committed fraud by: (1) failing to disclose that they were violating the Noncompete Covenant; (2) running a competing business in violation of the Noncompete Covenant; (3) misusing Bison's information, technology, and trade secrets for the benefit of their competing business; and (4) entering into the September 2013 Agreement with Bison and affiliated persons at the time they withdrew from Bison without disclosing their conflict of interest in entering into these agreements, all for the purpose and with the intent of deliberately misleading and defrauding Bison.

47.     Bison reasonably relied on the ostensible facts, which were material to Bison, that Kessler and Goddard: (1) were not violating the Noncompete Covenant; (2) were not running a competing business in violation of the Noncompete Covenant; (3) were not misusing Bison's information, technology, and trade secrets for the benefit of a competing business; and (4) were in all respects acting honestly and in good faith at the time they withdrew from Bison and induced Bison to enter into the September, 2013 Agreement, while in fact Kessler and Goddard were acting dishonestly for the purpose and with the intent of deliberately misleading and defrauding Bison.

48.     As a result of Goddard and Kessler's fraud, Bison has suffered damages, including that: (1) its information, technology, and trade secrets have been used by a competitor; (2) Bison has effectively funded the start-up costs of a competitor; and (3) Bison entered into agreements which permitted Walleye, Goddard and Kessler to continue to have access to Bison's information, technology and trade secrets after Goddard and Kessler resigned from Bison.

Wherefore, Bison requests entry of a judgment in its favor and against Kessler, and Goddard, awarding Bison:

12

(1) its damages, which are in excess of $75,000, and which include all of the profits that Kessler, Goddard, and Walleye have obtained as a result of their fraud, and Bison's lost profits;

(2) a preliminary and permanent injunction barring further violation of the Noncompete Covenant; and

(3) all other relief that the Court deems just and proper.

**COUNT V**
**(Tortious Interference With a Contractual Relationship against Walleye)**

1-48.   As paragraphs 1 through 48 of Count V, Bison incorporates by reference Paragraphs 1-48 of Count IV.

49.   Kessler and Goddard agreed to the Noncompete Covenant contained in Paragraph 6.4 of the Bison Operating Agreement.

50.   Walleye was aware that Kessler and Goddard were contractually obligated to abide by the Noncompete Covenant.

51.   Walleye intentionally and unjustifiably procured Kessler and Goddard's breach of the Noncompete Covenant without justification

52.   As a result of Walleye's tortious interference, Bison has suffered damages, including that its information, technology, and trade secrets have been used by a competitor, and that Bison has effectively funded the start-up costs of a competitor.

Wherefore, Bison requests entry of a judgment in its favor and against Walleye, awarding Bison:

(1) its damages, which are in excess of $75,000, and which include all of the profits that Walleye has obtained as a result of  its tortious interference, and Bison's lost profits; and

(2) all other relief that the Court deems just and proper.

## COUNT VI
### (Trade Secret Misappropriation under the Minnesota Uniform Trade Secrets Act against all Defendants)

1-52.    As paragraphs 1 through 52 of Count VI, Bison incorporates by reference Paragraphs 1-52 of Count V.

53.    As Kessler and Goddard acknowledged, Bison's "systems, codes, methods, pricing strategies, procedures, software programs, and any other information which is unique to the Company or which derives independent economic value from not being generally know or readily ascertainable by proper means" are confidential.  (Exhibit 1 at § 6.4(c)).

54.    The information and technology Bison utilizes in connection with its pairs trading, constitutes its methods, pricing strategies, procedures, and is not generally known or readily ascertainable.

55.    The information and technology Bison utilizes in connection with its pairs trading has tremendous economic value.  Indeed, without its pairs trading information and technology, Bison would lose the advantages it has over its competitors in terms of when to place trades and speed of execution.

56.    Bison has endeavored to keep its pairs trading information and technology secret, including by requiring members of Bison to sign the Noncompete Covenant and by limiting the access that various employees have to the information and technology.  Indeed, prior to September 2013, only Mr. Gildor, Chris Murphy, Lingling Wu, Kevin Murphy and Peter Goddard had access to the information and technology.  After the September 2013 Agreement, the same persons and Will England were to have access to Bison's information and technology with Goddard and England only having access because Goddard and the other defendants had fraudulently induced Bison to enter into the September 2013 Agreement.

14

57.    Nevertheless, Bison's information, technology, and trade secrets have been wrongfully used by Walleye and the other defendants in Walleye's pairs trading operation.

Wherefore, Bison requests entry of a judgment in its favor and against Kessler, Goddard, and Walleye awarding Bison:

(1) its damages, which are in excess of $75,000, and which include all of the profits that Kessler, Goddard, and Walleye have obtained as a result of their trade secret misappropriation, and Bison's lost profits;

(2) a preliminary and permanent injunction barring Defendants from using Bison's trade secrets;

(3) exemplary damages under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.03(b);

(4) an attorney fee award under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.04; and

(5) all other relief that the Court deems just and proper.

Dated:  August 7, 2014

**STAES & SCALLAN P.C.**

Stephen Scallan (stevescallan@staesandscallan.com)
Andrew Staes (andrewstaes@staesandscallan.com)
Michael Cohen (mcohen@staesandscallan.com)
111 W. Washington Street, Suite 1631
Chicago, IL  60602
Telephone:  (312) 201-8969
Facsimile:  (312) 201-9233

*Of Counsel*
LAW OFFICES OF GERALD D. HOSIER LTD.

Gerald D. Hosier (wizard@ozpd.com)
2020 Red Mountain Road
Aspen, CO 81611


**ROSS & ORENSTEIN LLC**


By: /s/ Jeff I. Ross
    Jeff I. Ross (jross@rossbizlaw.com)
    Alain M. Baudry (abaudry@rossbizlaw.com)
    Kelly K. Pierce (kpierce@rossbizlaw.com)
222 South Ninth Street, Suite 470
Minneapolis, MN 55402
Telephone:  (612) 436-9800
Facsimile:  (612) 436-9819

**ATTORNEYS FOR PLAINTIFF**