## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Bison Advisors LLC, a Minnesota limited liability company,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Irvin Kessler, Peter Goddard, and Walleye Trading Advisors LLC, a Minnesota limited liability company,<br><br>　　　　Defendants,<br><br>　　v.<br><br>Ephraim Gildor, Kevin Murphy, and Argos Capital Management, Inc.,<br><br>　　　　Counterclaim Defendants. | Case No. 0:14-cv-03121-DSD-SER<br><br><br><br>**DECLARATION OF<br>IRVIN KESSLER** |

I, Irvin Kessler, state and declare under penalty of perjury:

1.　　I was born in Duluth, Minnesota, graduated from high school in St. Louis Park, Minnesota, and attended the University of Minnesota for four years, but left approximately three courses short of receiving my degree.  I left the University because I wanted to be a trader on the Chicago Board Options Exchange ("CBOE"), and didn't want to wait any longer to start my career.  In February 1978, after spending five months as a clerk at the CBOE learning the business, I started trading for my own account using $10,000 my grandfather gave me as my initial capital.

2.      As I became successful as a trader, I hired clerks and trained them to trade. Over the next ten years, I probably trained and backed financially approximately 25-50 traders.

3.      In 1986, along with a partner, I founded Kessler Asher Clearing ("KAC"). KAC was a firm that cleared the trades of professional floor traders, and when we founded it our first customers were the traders I had trained and backed.  KAC was a member of the CBOE, the Chicago Board of Trade, the Chicago Mercantile Exchange, and a number of smaller exchanges.  We were also clearing members of the Options Clearing Corporation, the Board of Trade Clearing Corp, the Chicago Mercantile Corp., and NSCC, the clearing organization for the New York Stock Exchange.  By the early 1990s, KAC had about 150 traders as customers.  In 1988 and 1989, I was a member of the board of directors of both the CBOE and the Cincinnati Stock Exchange.  In 1990, I moved my family back to Minnesota, and I oversaw KAC from my home office in Minnesota.  In 1995, my partner and I sold KAC to another firm, which subsequently sold KAC to Goldman Sachs.

4.      In 1994, I founded Deephaven Capital Management and Deephaven Market Neutral Fund (collectively, "Deephaven") with two partners.  I was chief executive officer and chief investment officer of Deephaven Capital Management, which managed the Deephaven Market Neutral Fund.  The Deephaven Market Neutral Fund was a multi-strategy hedge fund.  At approximately the same time, I founded another company, Arbitrade, with Ephraim Gildor ("Gildor") to trade options.  Arbitrade and Deephaven were merged in 1997.  At the outset, the principal activity of Deephaven was trading

2

convertible securities. However, it was my goal to reduce reliance on trading convertible securities by introducing other trading strategies. One of those strategies was pairs trading. A relatively simple explanation of pairs trading can be found at http://en.wikipedia.org/wiki/Pairs_trade:

> The **pairs trade** or **pair trading** is a market neutral trading strategy enabling traders to profit from virtually any market conditions: uptrend, downtrend, or sideways movement. This strategy is categorized as a statistical arbitrage and convergence trading strategy. The pair trading was pioneered by Gerry Bamberger and later led by Nunzio Tartaglia's quantitative group at Morgan Stanley in the 1980s.

5.      I had personally started engaging in a form of what is now known as pairs trading in approximately 1982. The pairs trading I did was a sideline to my normal trading, and I used it primarily as a substitution strategy rather than as a standalone strategy. In other words, in my normal trading, I may have needed to buy, for example, Exxon stock because I was hedging an options strategy, but if I noticed that Exxon's price was up a lot lately and Mobil's price was not, I might buy Mobil instead and then when Mobil outperformed Exxon I would replace the Mobil stock with the Exxon stock I needed.

6.      In early 1997, I hired a trader for Deephaven named Tom Rectenwald. He became Deephaven's first pairs trader. Previously Mr. Rectenwald had worked at a fund in Duluth and had been very successful trading utility pairs. His initial pairs trading in the utility industry at Deephaven was very successful but a very small part of Deephaven's trading. So Mr. Rectenwald and I worked together to develop a framework for how to trade pairs. The framework that we worked out together in the late 1990s was

the pairs trading framework we used at Deephaven, and which was subsequently used at two other companies I started, Provident Trading Advisors LLC ("Provident") and Walleye Trading Advisors LLC ("Walleye").  Indeed, to this day, Walleye is using the pairs trading framework that we developed in its daily pairs trading.

7.    REDACTED

8.    Arbitrade (including Deephaven) was sold to a third party in 2000 because Mr. Gildor and I were not getting along, and I decided I didn't want to be in business with him any more.  I left the company at the end of 2001.  At the time I left, Deephaven had $1.2 billion under management.  At that time only 40% of that amount was invested in convertible securities; the rest was invested in other strategies, including pairs trading.

9.    One of the challenges with pairs trading as it was practiced at Deephaven and Provident, and with how it is currently practiced at Walleye, is that so long as the trading decisions are made by human beings, it is extremely difficult to make pairs trading scalable; in other words, it is hard to trade high volumes of pairs.  After being in this business for a long time, it was my observation that the barrier to making pairs trading scalable is that human traders each have their own individual "comfort zone" for trading, this is the level of risk they are willing to take, and despite many discussions and

efforts to encourage them to increase the size of their positions (trade out of their "comfort zone"), they did not do so. I also noticed that human traders make poorer trading decisions when they are out of their "comfort zone." The traders' reluctance is somewhat understandable since the traders' income is tied to the profitability of the portfolio they each manage.

10. In 2002, I started Provident as an umbrella for my trading. I had made my living as a trader for 25 years at that point, both trading my own portfolio and nurturing other traders. I was interested in continuing to trade and to bring in good traders to take advantage of my capital, my management, and my infrastructure.

11. Eventually the new management of Deephaven decided to largely exit the pairs trading business; due to the problems with making it scalable, it was too small a business for what was by then a multibillion dollar hedge fund. The only pairs trader Deephaven did not discharge was Mr. Rectenwald, because he was producing the best return on capital, and Deephaven's new management kept hoping that Mr. Rectenwald could make his trading scalable (increase his size and capital usage).

12. After Deephaven terminated the pairs traders, I hired, over time, all of them to come work at Provident. I will discuss each of the traders in the following paragraphs.

13. Ellie Meenan started working at Deephaven in about 1994 or 1995 as a trading assistant helping one of my partners, who ran the convertible securities trading, execute trades. After that partner left in 1999, Ms. Meenan did not "click" with his replacement, so I converted her to a pairs trader and taught her the strategy. When

5

Deephaven terminated her, I hired her at Provident. She is still working for me at Walleye. So she has worked for me most of the last 20 years.

14. I hired Gary Mickiewicz at Deephaven around 1997 to trade Japanese convertible securities. In 1999, he became uncomfortable with the Japanese market, so I converted him to a pairs trader and taught him the strategy. He also joined Provident after Deephaven terminated him, and he is still working for me at Walleye. He has worked for me most of the last 17 years.

15. Mark Doshan started at Deephaven in approximately 1998 doing trade executions for one of our strategies. In about 1999 or 2000, I converted him to a pairs trader and taught him the strategy. He has worked for me most of the last 16 years.

16. Brian Schwieters started his career at Deephaven as a stock analyst for the pairs traders around 2000, and I converted him to a pairs trader and taught him the strategy before I left Deephaven in 2001. When Deephaven terminated him, he engaged in some other employment, but eventually came back to work for me as a pairs trader at Provident, and he is still working for me as a pairs trader at Walleye. He has worked for me much of the last 14 years.

17. Steve Klammer started work at Deephaven around 1998 as a credit analyst for our convertible securities trading business. He left Deephaven to pursue other work in around 2000 and ultimately began pairs trading on his own, running a small fund. In 2008 or 2009, I hired him to be a pairs trader at Provident, and he continues to do pairs trading at Walleye. He has worked for me much of the last 14 years.

18.     Jim Linn did trade executions for one of Deephaven's strategies and worked there until its new owners closed Deephaven in 2009.  Mark Doshan was a good friend of his and offered to take him under his wing and teach him pairs trading if Provident would hire him.  We did so, and he continues to be a pairs trader at Walleye.

19.     Tom Rectenwald, who helped me develop the pairs trading framework we continue to use at Walleye as described above, stayed at Deephaven until its new owners closed it in 2009.  He then came to work with me again at Provident as a pairs trader, and he continues to be a pairs trader at Walleye.

20.     These individuals engaged at Deephaven and Provident, and continue to do so at Walleye, in high-turnover equity pairs trading.  "Turnover" refers to how frequently securities are bought and sold.  It is calculated by dividing the dollar value of securities traded over a particular period, by the total value of the portfolio.  The pairs traders at Deephaven and Provident traded with an average daily turnover of 25% or more, implying that a position in a pair is held for an average period of less than four days.  On average, pairs have historically been traded more often than once every four days (*i.e.*, they had a "turnover rate" of greater than 25%); typical historical turnover is approximately once every two days or greater (50% or greater).  This is a critical component of the pairs trading framework that Deephaven, Provident, and Walleye have been using the past 19 years.

21.     It is important to note that the turnover is not set to a certain amount, like 20% or 40%.  For example, a trader will put on a REDACTED

REDACTED

What determines turnover is how often the pair moves to a point where a trader would put on a position, and then how often it moves back to FV where the trader will take off the position to create a "flat" or zero position. So if you put on a trade this morning and this afternoon the position returns to FV, you will take it off this afternoon. This would create turnover of 100% or every day and a lot of profits. If, on the other hand, a trader puts on a position this morning, and the pair does not move to a point where you would either increase the position, or flatten it because it returns to FV, for five days, you will have turnover of once every five days, or 20%. The driver of changes in turnover is profitability! If we are in a market where the strategy is very profitable, the turnover will be much higher than if we are in an environment where we are unprofitable. To tell a trader that they can't take a profit when the profit is available is not only a completely alien concept which would diminish profits dramatically, in fact to artificially tie it to a number under 25% would likely render this strategy a losing strategy.

22.    While Ms. Meenan, Mr. Mickiewicz, Mr. Doshan, Mr. Schwieters, Mr. Linn, Mr. Klammer, and Mr. Rectenwald all earn a base salary, the majority of their income is derived from payments based upon the profitability of the portfolios in which they each pairs trade. Because the turnover rate of trading has always been greater than 25%, if this Court were to enter an injunction preventing Walleye from engaging in pairs trading with a turnover rate of 25% as Bison Trading Advisors LLC ("Bison") has requested, it would have a devastating impact on each of these individuals. They would

8

not be able to continue to engage in pairs trading at Walleye using the same framework they have used for the past 5 to 19 years, and the likelihood of making significant money trading a pairs strategy less often than once every 4 days would so badly disrupt the trading framework that it is likely they wouldn't be able to do pairs trading profitably. Indeed, if the Court granted the injunction Bison has requested, Walleye might not have any choice but to terminate these employees' employment given Walleye's current needs and their need for income. They will easily find other jobs. That would be a personal tragedy for them and us, as we feel like a family, that far outweighs any possible benefit Bison could realize from obtaining such an injunction.

23. I have mentioned Walleye above. What is it? In 2005, Peter Goddard and I founded Walleye Trading Advisors LLC ("Walleye") and its affiliated entities, Walleye Trading LLC ("Walleye Trading"); Walleye Investments Fund LLC ("Walleye Fund"); and Walleye Software LLC ("Walleye Software").

24. Walleye which along with Mr. Goddard and myself is a Defendant in this lawsuit, manages Walleye Trading and the Walleye Fund.

25. Walleye Fund is a hedge fund that owns Walleye Trading.

26. Walleye Trading is a registered broker-dealer that trades exclusively for its own account.

27. Walleye Software provides research, software development, and IT services to WTA.

28. In order to make pairs trading scalable, I felt it was necessary to create a computerized framework for trading pairs. As I thought about it, I felt that a computer

9

could:  consider pairing vastly more stock than a human can—tens of thousands of pairs rather than mere hundreds; could be active in more stocks simultaneously, perhaps thousands instead of just a few hundred; and could make trading decisions much more rapidly than humans could do so, thus dramatically increasing profits.  At least this was my dream!

29.     To act upon the thinking I describe in paragraph 27 above, I conceived of Bison as a research entity to attempt to develop a quantitative, algorithmic model for automating trading strategies, principally pairs trading, that would not involve human intervention or judgment.

30.     In order to move forward with my idea for Bison, Mr. Goddard and I became interested in working with Dr. Kevin Murphy, a University of Chicago economics professor to conduct the research and develop the model for Bison that I had conceived.  Dr. Murphy had previously partnered with Mr. Gildor to form Axiom, which managed funds trading currencies, and was working on some models that traded equities with relatively long-term holding periods.  Mr. Goddard and I wanted to see if Murphy could use his quantitative analytical skills to develop a systematic way of finding and trading pairs that could allow for a much broader-based and scalable approach to pairs trading than the existing Provident pairs trading strategy.

31.     Because of Mr. Gildor's existing business relationship with Dr. Murphy, Mr. Goddard and I could not work with Murphy on the Bison project unless Mr. Gildor was involved too. Based upon my belief in the power of pairs trading, I put aside my resolve never to work with Mr. Gildor again in order to be able to work with Dr. Murphy.

10

32.    As a result, Bison was formed in December 2010.  Bison's original members included Mr. Goddard; Mr. Gildor; Dr. Murphy; Mr. Gildor and Dr. Murphy's company, Axiom; two Axiom employees, Dr. Lingling Wu and Chris Murphy (Kevin Murphy's son); me; and two investors not actively involved in the business, Mr. Kushnir and Mr. Lyons.  From its inception, Bison never had any of its partners, including Dr. Murphy, Mr. Gildor, Dr. Murphy, and Dr. Wu, as full-time employees of Bison. We knew they would only give Bison as much time as they felt they could spare from their other responsibilities.  This is another reason it makes no sense that we would sign a non-compete, which would require terminating our existing pairs trading, when there was NO contractual obligation from the Axiom side to provide time to the Bison project!  Since they were all Axiom employees or partners, until Axiom closed, their main responsibility was to Axiom's investors, not Bison.  Even after Axiom closed, Bison had no contractual or other claim to the ex-Axiom partner's time.  Also, Dr. Murphy, the key intellect behind Bison, had many other responsibilities including teaching and research at the University of Chicago, as well as numerous consulting responsibilities.  Mr. Gildor has many other business interests and has spent many months over the last four years climbing mountains.  When we entered into this agreement, Mr. Goddard and I were providing very valuable information to Bison/Axiom, with no assurance that they would actually put effort into developing a model.  I estimate that over the last four years Bison has taken up less than 20% of Dr. Murphy's time and less than 5% of Mr. Gildor's.

33.    When Bison was formed, it was clear to Mr. Gildor and Dr. Murphy that I did not intend for Provident or other companies with which I was associated to stop

11

executing pairs trades based on individual human judgment.  At the time we formed Bison, the only thing Bison had was my concept of an idea for automating the pairs trading strategy to take out the human factor and increase the universe of pairs.  Because the research and development had not yet been performed at its inception, Bison did not have a functioning model, nor was it clear it ever would.  Since it was completely uncertain and speculative whether Bison would succeed in developing a model that would work well enough to entice investors to put up risk capital to use the model for trading, or what that model's turnover would look like, it would have made no sense for me to agree at Bison's inception to discontinue Provident's highly profitable pairs trading REDACTED or to direct Provident's pairs traders to drop their turnover to less than 25% so that they would make less money, purely on the speculation that Bison might someday have a successful trading model consistent with Kessler's idea.

34.    I had another concern that I discussed with Mr. Gildor and Dr. Murphy.  In order for Bison to perform its research, Provident was going to provide Bison with full records of all of its pairs trading activities for the preceding four years in electronic form. From this data, Mr. Gildor and Dr. Murphy and their staff, including Dr. Wu and Chris Murphy, would be able to fully understand and perhaps fully duplicate the framework that Mr. Rectenwald and I had developed for human pairs trading.  I wanted to protect Provident and myself from Bison, Mr. Gildor, or Dr. Murphy using the confidential, valuable data they would be receiving about Provident's pairs trading to recreate outside of Bison what Provident was already doing using human traders.  Because Axiom, the

12

company which Mr. Gildor and Dr. Murphy were already involved in, was researching some long-term-hold equity strategies before this, the non-compete covenant was written in a way that would allow Axiom to continue with longer term strategies, while constraining Bison, Mr. Gildor, Dr. Murphy, or Axiom from using the knowledge Axiom was gaining from Provident's confidential, valuable data, including the fact that pairs trading could be as profitable as it was following the methodologies we had developed.

35.     Thus, it is true that turnover of greater than 25% was put into the Bison operating agreement (which has now been superseded and is referred to in our Counterclaim as the Former Bison Operating Agreement) to establish a "bright line rule," but the bright line rule is not as Mr. Gildor describes it.  It was a bright line rule to prevent Bison, Mr. Gildor, Dr. Murphy, or Axiom from using what they learned from the information given them by Provident to develop strategies outside of Bison.  Provident had a turnover rate that averaged in the range of 50%, and was virtually never less than 25%, so I felt that using a 25% turnover in the restrictive covenant would give Provident and me adequate protection, because the Provident framework wouldn't work at a turnover rate of 25% or less.  In fact, when the 25% language became part of the noncompete, Bison did not know what its turnover would be.  To the extent the language in the Former Bison Operating Agreement can be read to prevent companies in which I am involved such as Provident and Walleye to engage in the pairs trading using the framework they have historically used would be exactly the opposite of what was intended by the parties, and there was clearly a mistake made in drafting that neither party noticed or understood before signing the Former Bison Operating Agreement.

13

36.     Mr. Goddard caused Provident to send its complete pairs trading data for the preceding four years to Bison and Dr. Murphy in June 2010.  This data, which Dr. Murphy was to analyze as a first step in developing a fully automated pairs trading system for Bison, showed that Provident was engaging in equity pairs trading with an average daily turnover of more than 25%.  The turnover ranged from much higher than 25%, to something just above 25%, over a long time period.  This turnover rate data was consistent with the fact that in the framework Mr. Rectenwald and I developed, when market opportunities created a lot of profitability, the turnover was higher, and when profitability was poor, the turnover was lower.  Dr. Murphy used this Provident data to reverse engineer the successful strategies employed by the traders at Provident to develop a quantitative, systematic model for Bison.

37.     In March 2011, for reasons independent from Bison's business, the pairs traders who had been working for Provident became employed by Walleye where they are known as "Walleye West" (because they worked on the Walleye building's West side).  These pairs traders, all of whom I have identified above, continued executing the same high-turnover pairs trading strategy that they had been performing for Deephaven and Provident for years, only now they were doing it at Walleye.  Bison, Mr. Gildor, Dr. Murphy, Dr. Wu, and Chris Murphy all knew that Provident's pairs traders had moved to Walleye.  Their pairs trading activity was openly discussed by me with Bison's members, including Mr. Gildor and Dr. Murphy throughout the period from 2011 through 2014.

38.     Bison, under Dr. Murphy's direction, spent most of 2011 conducting research regarding pairs trading strategies using Provident's data.  It was not until the

14

third quarter of 2011 that Dr. Murphy had developed a fully automated pairs trading strategy that Bison was interested in bringing to production.

39.     Starting in late 2011, from its inception of becoming a trading strategy operating in the marketplace, Bison's automated pairs strategy was executed at Walleye, financed exclusively by Walleye, risk managed at WTA, on systems developed and supported by Walleye Software.  All profits of Bison's trades went into the Walleye Fund; Bison earned compensation as a percentage of profits, paid out of the Walleye Fund.

40.     Here is how the Bison strategy is executed:  every evening, Bison (typically Dr. Wu or Chris Murphy) sends Walleye electronic instructions for Bison's pair strategy. (Dr. Wu and Chris Murphy became Walleye employees in 2013, after having been Axiom employees; their job duties didn't change.)  The instructions include the symbol of each stock in a pair; the pair-ratio-price at which to begin opening a short position in the pair; the pair-ratio-price at which to complete the opening of a short position in the pair; the maximum size to have in each pair; the pair-ratio-price at which to begin closing (buying back) some of the short position in a pair; the pair-ratio-price at which to fully complete the closing (buying back) of the short position of a pair; similar numbers for the long side; and a maximum position by-stock-across-all-pairs (as opposed to within-a-single-pair).  The next day, Walleye executes the trades automatically according to Bison's instructions, without any discretion or input from any human, including input from individual traders.

15

41.     Neither myself nor any of the individual Walleye pairs traders have any access to the algorithms used by Bison.  The Walleye pairs traders each have developed their own database of pairs which they can draw upon for trading that are unique to the individual trader and are not shared with the other pairs traders at Walleye.  Each of the pairs traders develops their own parameters for when and how to trade each of their pairs, as well as when to take a position and become active in a pair and when to liquidate a position in a pair.  None of the Walleye pairs traders have ever had access to Bison's confidential information.  None of the Walleye pairs traders have ever had occasion to use Bison's confidential information.  Each of the Walleye pairs traders operates autonomously from one another and largely autonomously from management.  The Walleye pairs traders are completely separate from Bison and Bison's automated pairs trading platform strategy.

42.     Mr. Gildor was an investor in the Walleye Fund from 2006 until June 30, 2014, and he benefitted personally from its profitability and from the pairs trading done by the Walleye pairs traders for the benefit of the Walleye Fund.

43.     After Bison began actively trading in December 2011, Mr. Goddard repeatedly and openly shared with Mr. Gildor, Dr. Murphy, and Bison private information about Walleye's pairs trading activity and the performance of the Walleye pairs traders.  This information was provided by Mr. Goddard so that Bison could tweak the model it had developed to improve its performance.  Inherent in the information provided by Mr. Goddard to Bison after December 2011, just as was inherent in the data

16

for the preceding four years which he had previously provided to Bison, was a complete set of data from which turnover rates could be easily calculated.

44.     At no time, either when Mr. Goddard and myself were still members of Bison through June 1, 2013, or for approximately one year after then, did Bison, Mr. Gildor, or Dr. Murphy advise Walleye, Mr. Goddard, or me that they objected to the turnover at Provident or Walleye, or that they believed the Former Bison Operating Agreement's non-compete covenant was being breached. And when Bison first objected to Walleye's turnover, it was not based on Walleye's turnover exceeding 25% or the noncompete covenant. Attached as Exhibit 1 is a true and correct copy of an email from Dr. Murphy to me and Mr. Goddard dated June 17, 2014, in which he addresses Walleye's turnover. Nowhere in the email does Dr. Murphy mention the noncompete covenant or its 25% threshold.

45.     In the Summer of 2013, Mr. Goddard provided the Walleye pairs traders two software tools to improve their pairs trading efficiency.  One tool is used to calculate the exponential moving average ("EMA") of stock prices.  Using an EMA rather than a simple moving average weighs recent prices more heavily than past prices.  This EMA is the determinant of the Fair Value of the ratio between two stocks in a pair.  The other tool is a simple linear model that maps pair-price to appetite-for-position, internally dubbed a "parallelogram."  Mr. Goddard provided the pairs traders these tools to lessen their workflow on generic tasks to allow them more time for fundamental research for their portfolio.

46.     These new software tools replaced similar tools available on multiple outside vendor systems; however, they were not all together on one outside vendor system in a simple to use, time-saving package.  Neither tool that Mr. Goddard provided the Walleye pairs traders was developed by Bison, or obtained from Bison.  They are similar to generic, well-known tools, readily available from financial services firms such as Knight, Interactive Brokers, Pair Trading Labs, Chronos Technologies' Iris, Prodigio at Ameritrade, and Bloomberg, amongst others.  They are not proprietary to Bison or anyone else.  Because the Walleye pairs traders each operate autonomously, how and whether each individual Walleye pairs trader uses these tools, day-by-day and pair-by-pair, was entirely at each trader's discretion.  All pair selection and other trade-related parameters continue to be controlled by each individual Walleye pairs trader, with skills and methods each had respectively honed over the previous decade, or longer.

47.     Bison uses complicated, quantitative methods for picking which stocks to use as pairs; decomposing the historical price information of the pairs; understanding the relative value inherent in respective overnight, morning, and daily pair-price movements; and deciding how aggressively to trade each pair, in terms of speed and quantity.  Bison does not use moving averages in its model, a key component of the Walleye method.  The Walleye pairs traders were never provided or exposed to, and have therefore never used, any of  Bison's methods for picking pairs, valuing the pairs, or deciding how aggressive to be.  The Walleye pairs traders were never provided or used any of Bison's trading instructions.  The Walleye pairs traders were never provided or used any information

18

obtained from Bison.  In contrast, Mr. Goddard regularly provided Mr. Gildor, Dr. Murphy, and other Bison members performance data regarding the Walleye pairs traders.

48.     Toward the end of the first quarter of 2013, Mr. Gildor and Dr. Murphy decided to close down their Axiom currency-trading operations.  Mr. Gildor still needed personnel to operate his business ventures, so he requested that Mr. Goddard and I employ his personnel in their Walleye operations.  Mr. Goddard and I agreed to do so, as well as to assist Mr. Gildor in winding down Axiom.  As a result, former Axiom employees and Bison members Chris Murphy and Dr. Wu became employed by Walleye Software, as did Mr. Gildor, Mr. Gildor's personal assistant, and three individuals associated with a currency strategy and to do other research into strategies Mr. Gildor and Dr. Murphy might be interested in or wanted to perpetuate.

49.     In April 2013, Walleye began executing a strategy in cash equities called "Bison_VWAP" that trades based on signals from commodity prices, with a percentage of profits flowing to Bison via a schedule identical to that of the Bison pairs trading strategy schedule.  The Bison_VWAP strategy was developed by Paul Thompson with the help of Dr. Murphy, Mr. Gildor, Dr. Wu, and Chris Murphy, and had been trading at Axiom for some period of time prior to April 2013.

50.     In June 2013, Walleye hired Will England, and Walleye began executing a "Futures Momentum Strategy" he had developed with the help of Dr. Murphy.  After subtracting compensation for England, the percent of profits participation schedule was identical for this strategy as it was for the Bison_VWAP and pairs strategies.  Together, the three strategies became known as the "Bison Umbrella."

19

51.    On or about August 28, 2013, the members of Bison entered into a new agreement, referred to in the Complaint as the "September 2013 Agreement," that terminated and superseded the Former Bison Operating Agreement.  Pursuant to the September 2013 Agreement, Mr. Goddard, Chris Murphy, Dr. Wu, Mr. Kushnir, Axiom, Mr. Lyons and myself withdrew as Bison members effective June 1, 2013, leaving as members only Dr. Murphy and Mr. Gildor.  In the September 2013 Agreement, it was agreed that profits from trading based on Bison's instructions would be split approximately 50/50 between the former Axiom-side members (Dr. Murphy, Mr. Gildor, Chris Murphy, and Dr. Wu) and the former Walleye-side members (Mr. Goddard, Mr. Kushnir, Mr. Lyons, and myself).  A portion of the future payments going to the former Walleye-side members was intended to be compensation for providing the capital for the Bison trading.

52.    Under the September 2013 Agreement, Mr. Gildor and Dr. Murphy agreed that Walleye Software and Bison jointly owned any intellectual property that was mutually used or developed.  The September 2013 Agreement does not contain a noncompete covenant.  Mr.  Goddard and myself received no payment for giving up our membership interests in Bison.

53.    After the restructuring under the September 2013 Agreement, Bison continued providing its pairs trading instructions electronically every evening for automatic execution by Walleye Trading the next day.  But Bison has been providing those instructions to former Bison members Chris Murphy and Dr. Wu, who became Walleye Software employees effective on or about June 1, 2013.  Bison has been

20

providing that information to Walleye Software for over 15 months without any agreement or obligation on the part of Walleye Software to maintain that information as confidential.

54. Similarly, since the fourth quarter of 2013, all of the data that Bison processes to establish its trading instructions have been maintained in a database licensed and operated by Walleye Software and stored on computers owned by Walleye Software. Since March 31, 2014, Bison has been processing that data on computers owned by Walleye Software. Thus, Bison has not only been providing its purportedly confidential information to Walleye Software's employees without any confidentiality agreement, it has also been storing and developing that purportedly confidential information on Walleye Software's equipment without any agreement or obligation by Walleye Software to keep that information confidential.

55. In the Spring of 2014, I informed Mr. Gildor and Dr. Murphy that I thought Bison needed a full-time employee to more professionally manage its pairs-trading operation. Walleye was providing the trading capital for Bison's pairs trading, and it was yielding low returns for both Bison and Walleye; indeed, Walleye's return on investment was unacceptably low. I told them that Bison was being neglected and unless this changed, I did not want to continue having Walleye back Bison's trading. Even with Axiom no longer in existence, none of the people associated with the Bison strategy were required to work full time on Bison. Certainly Mr. Gildor and Dr. Murphy worked very little on Bison. Chris Murphy and Dr. Wu, while working on the Bison strategy at times, were at the beck and call of Mr. Gildor to research or develop other strategies and to

21

continue to be involved in research and maintaining a currency trading strategy for Mr. Gildor called Nina Mountain. I insisted that we have a full-time manager of Bison whose responsibility was to keep a focus by all parties on continuing to improve the strategy. I also suggested that we hire Will England to be that person, and that it could be in everyone's best interest to have him spend some of his time working with Walleye's pairs traders. At a meeting attended by Mr. Goddard, Dr. Murphy, Mr. Gildor, Chris Murphy, and me, it was agreed that Chris Murphy and Mr. England would co-manage Bison's pairs strategy. At the same meeting, it was agreed that Mr. England would also be working on improving Walleye's pairs trading, that Walleye would pay one-third of Mr. England's compensation, and that Bison would pay the other two-thirds. The goal of this was to begin a continuous cross flow of ideas between the two groups with the idea of improving both. It was felt by all parties that Walleye's pairs traders were better than Bison at picking pairs, and that Bison was better at trading on a larger scale. By sharing information, we hoped both Walleye's pairs traders and Bison would benefit. In fact, the same day as the meeting I introduced Dr. Murphy and Chris Murphy to the Walleye pairs traders so they could begin learning why the pairs traders were so good at picking pairs.

56.     Consistent with the newly-established mandate, Mr. England openly shared with Bison information about Walleye's pairs trading, just as Goddard had previously done. From this data and analysis, Dr. Murphy and Chris Murphy noticed that the Walleye West traders had increased their trading turnover and profits during the prior summer, moving to a turnover rate close to 50%, and Mr. England noted that the new software tools that had been introduced to the Walleye pairs traders' toolkit. Dr. Murphy,

22

Mr. Gildor, and Chris Murphy complained that Walleye pairs trading had become more automated, and therefore more similar to Bison, arguing that automated pairs trading was intended to be Bison's focus. They initially did not raise the 25% rate threshold in the restrictive covenant as an issue. Mr. Goddard and I pointed out to them that the new tools which had been introduced were completely dissimilar from what Bison's software did, and in fact only related to automating the instructions for trade execution rather than selection of pairs or the setting of trading parameters, the two key components of Bison's software.

57. Dr. Murphy brought up a point we thought was fair; even though there was never an intent to stop Walleye from trading pairs, the design of the non-compete should have been to restrict Walleye from fully automating its pairs trading. After discussing how we could draw the line and define what automation is or how much technology would it take to go over this line, Mr. Goddard and I, in conjunction with Dr. Murphy, determined the best solution was to merge the pairs trading operations of Bison and Walleye into a single business.

58. We were making progress on negotiating such a merger, but the sticking point was Mr. Gildor. At an earlier meeting, Mr. Gildor outright falsely stated to me that he had no idea Walleye's pair traders had been engaging in pairs trading and if he had known he would not have shut down Axiom. I considered this an outrageous statement, and it thus became clear to me that Mr. Gildor was acting in bad faith and that I could no longer continue working with him.

59.     Notwithstanding my feelings about Mr. Gildor, Mr. Goddard and I wanted to continue the relationship with Dr. Murphy, so we attempted to resolve the dispute by negotiating a buy-out of, or a new deal for, Mr. Gildor's interest in Bison (which he held through Bison member Argos Capital).  Mr. Gildor squelched the deal by demanding multiples of what his interest in Bison was worth.

60.     In June 2014, while we were still in negotiations with Dr. Murphy and Mr. Gildor, I told them that because Walleye's return on invested capital in Bison was unsatisfactory, that if we were unable to work something out, Walleye would probably terminate its relationship with Bison and utilize its capital more productively.  Our prior arrangement by which Walleye provided Bison capital to fund its pairs trading activities was at will and could be terminated at any time.

61.     In early August 2014, when it became apparent that Bison and Walleye would not be able to strike a deal, Walleye gave Bison notice of its intent to cease funding Bison and its intent to stop utilizing its personnel and equipment to execute Bison's trades, effective November 1, 2014.  By giving nearly 90 days notice, it would allow Bison to arrange alternative sources of capital and an alternative vendor to place and broker its trades.

62.     Shortly thereafter, without any notice or direct attempt to resolve the dispute, Mr. Gildor caused Bison to commence this action, and it is my opinion that Mr. Gildor did so to try to coerce Defendants into paying him vastly more than his interest is worth.  We will not do so; we will only pay him the fair value of his interest which is

24

rapidly diminishing as the lawsuit has caused a falling apart of the working relationship between the parties and distracted from needed improvements in the strategy.

63.    If this Court were to enter the injunction that Bison seeks, it would for all practical purposes put Walleye out of the pairs trading business for a long time to come. If the injunction is entered, either the pairs traders will quit and go to work elsewhere to preserve their income, or Walleye will have to terminate them.  In all likelihood, all or most of the pairs traders would immediately secure employment with other funds, given their experience and performance records.  Because there are not a great many pairs traders in the Twin Cities area, if Walleye were to want to resume pairs trading after an injunction expires (which, given the two-year duration of the restrictive covenant, should occur on June 30, 2015), it would have a very difficult time assembling a comparable group of experienced pairs traders willing and able to learn the system Mr. Rectenwald and I developed in a short time; if it was even possible, it would likely take years to build a pairs trading team comparable to what Walleye has now.  In the likely case Walleye's pairs traders did get other jobs, they would continue trading exactly the same as they are today, and any "cost" to Bison would continue.  In fact, their disseminating these tried and true methods to other funds could create even more competition to Bison.

64.    REDACTED

REDACTED

65.    I have read the Declaration of Mr. Gildor submitted in support of Bison's motion. While I believe that my testimony in the foregoing paragraphs adequately addresses all of the subject matter covered by Mr. Gildor, I do have some specific comments in response to specific statements made by Mr. Gildor in his Declaration, as follows:

(a)    In paragraph 6 of his Declaration, Mr. Gildor states that "Kessler's contributions to Bison were to be largely, if not wholly, nonproprietary, that is trading capital and trade execution." That is not true. In addition to contributing the very idea for Bison, through Provident Mr. Goddard and I also contributed four years' worth of Provident's pairs trading data that Dr. Murphy and Bison could mine in order to develop Bison's algorithms and software. This body of data was extremely valuable for this purpose. Bison's pairs strategy would never have been created without the data and my conviction in the strategy. Walleye was never part of Bison. There was never a written or oral agreement that required Walleye to put up trading capital to Bison for any period of time; the relationship was oral and at will. In fact, the Former Bison Operating Agreement obligated partners to meet capital calls pro-rata. After the Bison strategy was developed, approximately one year after the Former Bison Operating Agreement

was signed, Mr. Goddard and myself decided that it would be appropriate for Walleye to provide those services and capital if Bison was willing to pay a fair price for it.

(b)     In paragraph 6 of his Declaration, Mr. Gildor also states that he "was to contribute to Bison highly valuable, pre-existing proprietary trading technology." I have no idea what he is referring to when he uses the term "pre-existing proprietary trading technology." There was never a discussion of such technology being owned by Mr. Gildor. Bison was organized to obtain Dr. Murphy's services, not a technology belonging to Mr. Gildor.

(c)     With respect to paragraphs 7 and 8 of Mr. Gildor's Declaration, it was the intent of the parties to exclude all pre-existing strategies practiced by any of the parties from the restrictive covenant. This was explicitly agreed upon. It was a mistake that pairs trading was not explicitly mentioned in the Former Bison Operating Agreement.

(d)     In paragraph 13 of his Declaration, Mr. Gildor states that when he initially worked for KAG at the Chicago Board of Trade, he employed "quantitative trading methods that I developed." I have no idea what he means by this, and as I understand the term "quantitative trading methods," this would not be a true statement.

(e)     With respect to the statement in paragraph 24 of Mr. Gildor's declaration that "Prior to Bison's formation, I created, and successfully employed, both through Axiom and personally, mathematical models for computer executed

27

mean reversion trading strategies having 'an average daily turnover of 25 percent or more.' These strategies were the predecessors for the pairs trading strategies employed at Bison. I contributed such models to Bison at the time of Bison's formation, along with other valuable technology for the math based, computer trading of equities and commodities with an average daily turnover of 25 percent or more," I have never before heard that Mr. Gildor had such models or that he ever contributed them to Bison, and, at this point in time, I do not have enough information to know whether what he is saying is true or not, though the fact that I never heard about them before makes me suspicious of the veracity of his statement.

(f)     I do not have sufficient knowledge of the algorithms used by Dr. Murphy and Bison to know whether, as Mr. Gildor contends in paragraph 26 of his Declaration, Bison developed "many novel trading techniques."

(g)     With respect to paragraph 35 of Mr. Gildor's Declaration, I without qualification deny his statement that I "did not seek an exemption from the Agreement for the 'pairs trading strategy;'" as discussed in the foregoing paragraphs, the parties did intend to exclude all pre-existing strategies, and the document is mistaken in failing to include pairs strategy.

(h)     Mr. Gildor's description of the June 18, 2014 meeting at Bison's Mokena, Illinois meeting is inaccurate in some respects. First, I never said Walleye is trading pairs strategies in commodity markets; we don't. Second, I did not "concede" anything; I did state the obvious, that Walleye trades at a greater

28

than 25% turnover rate, and that Mr. Gildor and Dr. Murphy had known that all along.

(i)     None of what Mr. Gildor says in paragraph 38 about what he "demanded" or "offered" at the June 18 meeting is true, to the best of my recollection.  In particular, he did not demand we cease our pairs trading activity as we had always practiced it.

(j)     Mr. Gildor knew, from data given to him at the inception of Bison, as well as informational updates he received over the years, Provident and Walleye's pairs trading was generally much higher than 25%.  When in paragraph 40 of his Declaration he notes that daily turnover began to increase sharply in early July 2013 and that by early August 2013, "the 21 day moving daily average was over 50 percent," Mr. Gildor was just cherry picking from a limited portion of the database to try to prove a specious point.  As I pointed out above, when the strategy is doing well, turnover tends to increase, and had he looked at the entire history, he would have seen that to be true.  And because trading tends to increase as the market improves, and because Bison was designed based upon Provident's historical data, it is hardly surprising that there would be great similarity in how their trading tracked each other on a percentage basis.

(k)     With reference to paragraph 41, the decision to hire Will England was a joint decision of Walleye and Bison.  Although he was technically employed by Walleye, Bison and Walleye split his salary, and he had separate but related job duties for each.

29

(l)     There was never any "secret" trading as implied in paragraph 43 and 44 of Mr. Gildor's Declaration.  The trading data given to Bison and Dr. Murphy contained full information regarding historic turnover, and the update information given to them from time to time thereafter did as well.  Indeed, Mr. Gildor even claims to have discovered the rate of turnover from data Walleye voluntarily provided him.  There were no secrets.  Mr. England was never instructed to withhold any information from Gildor and, in fact, gave him any information he asked for.  Mr. C. Murphy and Dr. Wu became adept coders of the Walleye database starting mid-2013.  Since that time, they have had unrestrained access to all information at Walleye, including every nugget of data related to Walleye West.

(m)     With respect to the claims in paragraphs 45 and 46 of Mr. Gildor's Declaration to the effect that there are difficulties in calculating the amount of damages, if any, that Bison has suffered, I contest that assertion.  Given that there are complete electronic trading records of all of Walleye's and Bison's trading activities, as well as electronic records of how the prices of stocks being traded being moved over time (even minute by minute or second by second), it would be relatively simple to develop one or more methodologies to calculate any damages to a reasonable degree of certainty.  While I don't think Bison has a valid claim for

30

damages, I am confident that a qualified expert witnesses could make these calculations to a reasonable degree of professional certainty.

**I declare under penalty of perjury that everything I have stated in this document is true and correct.**

Dated this 26th day of September, 2014 in Hennepin County, Minnesota.


    *s/ Irvin Kessler*
    Irvin Kessler