UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 14-3121(DSD/SER)

Bison Advisors LLC, a Minnesota
limited liability company,

                Plaintiff,

v.                                                          **ORDER**

Irvin Kessler, Peter Goddard and
Walleye Trading Advisors LLC, a
Minnesota limited liability company,

                Defendant.


Jeffrey J. Bouslog, Esq. and Oppenheimer, Wolff &
Donnelly, LLP, 222 South Ninth Street, Suite 2000,
Minneapolis, MN 55402, counsel for plaintiff.

William Z. Pentelovitch, Esq. and Maslon, Edelman, Borman
& Brand, 90 South Seventh Street, Suite 3300,
Minneapolis, MN 55402, counsel for defendant.


This matter is before the court upon the motion for a
preliminary injunction by plaintiff Bison Advisors, LLC (Bison).
Based on a review of the file, record, and proceedings herein, and
for the following reasons, the court denies the motion.


**BACKGROUND**

This business dispute arises out of the alleged breach of and
interference with a noncompete agreement by defendants Irvin
Kessler, Peter Goddard, and Walleye Trading Advisors LLC. Kessler
and Goddard were founding members of Bison, a computer-based
commodities and equities trading firm. Am. Compl. ¶¶ 9, 16, 18.

Bison was jointly created in 2010 by Kessler and Ephraim Gildor, a specialist in quantitative, math-driven, and computer-executed trading strategies.  Id. ¶ 16; Gildor Decl. ¶ 23.

In 2003, and before forming Bison, Gildor founded Axiom, a hedge fund focused on computer-executed trading of foreign currencies.  Amend. Compl. ¶ 14.  Axiom's founding members included Gildor, professor Kevin Murphy, and physicist Linling Wu.  Id.  Axiom, Murphy, and Wu were also founding members of Bison.  Id. ¶ 18.

Defendant Walleye Trading Advisors LLC, and its affiliated entities Walleye Trading LLC, Walleye Investments Fund LLC, and Walleye Software LLC (collectively, Walleye) were formed in 2005 by Kessler and Goddard.  Kessler Decl. ¶ 23.  Before forming Walleye, Kessler founded Deephaven Capital Management and Deephaven Market Neutral Fund (collectively, Deephaven).  Id. ¶ 4.  In 1997, Kessler hired Tom Rectenwald to develop a pairs trading framework for Deephaven.[1]  Id. ¶ 6.  Kessler eventually left Deephaven, and the pairs traders that Rectenwald and Kessler hired followed Kessler to

---

[1] Pairs trading involves tracking the prices of two historically correlated equities.  When the prices diverge, a trader buys the underperforming equity and sells the overperforming equity, betting on a return to the historical correlation.  Am. Compl. ¶ 41.

Walleye.[2]  Id. ¶¶ 8, 12-19, 37.  The Deephaven and Walleye traders regularly achieved average daily turnover rates of 25 percent or higher.[3]  Id. ¶¶ 20, 36.

Kessler approached Gildor in 2010 with a proposal that would implement pairs trading through Gildor's and Axiom's expertise in computer-executed trading strategies.  Am. Compl. ¶ 16; Kessler Decl. ¶ 29.  Bison was formed as a result.  Am. Compl. ¶ 16. Kessler and Goddard provided Bison with historical pairs trading data from Deephaven and Walleye so that Gildor, Murphy, and the rest of the Axiom team could develop the models to be employed at Bison.  Id. ¶¶ 20, 22; Kessler Decl. ¶¶ 34, 36, 43; Goddard Decl. ¶¶ 10, 11.  Bison began trading in June 2011.  Goddard Decl. ¶ 23. Every evening, Bison electronically provides Walleye with pairs trading instructions, which Walleye automatically executes the following morning.  Kessler Decl. ¶ 40.

On December 21, 2010, the Bison members signed an Operating Agreement, which included the following noncompete covenant:

> (a) During the period of time that any Person is a Member of [Bison] and for two (2) years after the date of withdrawal or removal of a Member, such Person will not directly or indirectly ...

---

[2] Before joining Walleye, the traders were transferred from Deephaven to Provident, another Kessler firm.  Kessler Decl. ¶¶ 10, 12-19.

[3] Turnover rate refers generally to the rate at which securities are bought and sold.  It is determined by dividing the dollar value of securities traded over a particular period by the total value of the portfolio.  Kessler Decl. ¶ 20.

> (i) engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which trades or plans on trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more.

Am. Compl. Ex. 1 at ¶ 6.4.  The members further agreed that "irreparable injury will result to [Bison]" in the event the covenant is breached, and that money damages would be impossible to measure for such a breach.  Id. ¶¶ 6.4(d); 10.12.

Walleye's individual pairs traders operate separately from Bison's automated platform and do not have access to the models and algorithms used by Bison.  Kessler ¶ 41.  Trading at Walleye became more automated and systematic during the summer of 2013, however, and over the next year and a half the turnover rates and trading patterns at Walleye began to closely match those of Bison.  Am. Compl. ¶ 38; Kessler Decl. ¶ 45, 56, 57; Gildor Decl. ¶ 40.  Gildor and the other members[4] of the Axiom team were made aware of this change around May or June 2014.  Gildor Decl. ¶¶ 36, 39, 40. Moreover, Bison alleges that this was the first time it became aware that the pairs traders at Walleye were using strategies with average daily turnover rates in excess of 25 percent.[5]  Am. Compl.

_____

[4] Kessler and Goddard withdrew from Bison around the summer or fall of 2013.  Am. Compl. ¶ 33; Kessler Decl. ¶ 51.  Although the parties disagree as to the validity of this withdrawal, the court need not consider those arguments at this time.

[5] Defendants argue that, by providing pairs trading data to Gildor and the rest of the Axiom team, Bison was notified much
(continued...)

¶ 40.   Bison alleges that defendants violated the noncompete agreement by using Bison's confidential information to implement trading strategies at Walleye with average daily turnover rates of 25 percent or more.   Gildor Decl. ¶ 41; Gildor Suppl. Decl. ¶ 29.

On August 7, 2014, Bison filed suit, alleging (1) breach of noncompete covenant, (2) breach of fiduciary duties, (3) aiding and abetting breach of fiduciary duties, (4) fraud, (5) tortious interference with a contractual relationship, and (6) misappropriation of trade secrets.[6]   On September 5, 2014, Bison moved for a preliminary injunction, limiting the motion to the noncompete claim.


**DISCUSSION**

A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety.   <u>Watkins Inc. v. Lewis</u>, 346 F.3d 841, 844 (8th Cir. 2003).   The court considers four factors in determining whether a preliminary injunction should issue: (1) the likelihood of the movant's ultimate success on the merits, (2) the threat of irreparable harm

---

[5](...continued)
earlier as to the turnover rates of Walleye's pairs traders.   <u>See</u> Kessler Decl. ¶ 36.   Because Bison has not shown a likelihood of success on its noncompete claim, as explained below, the court does not consider arguments as to notice at this time.

[6] Bison submitted an amended complaint on September 25, 2014. The court considers these amended allegations in deciding the instant motion.

to the movant in the absence of relief, (3) the balance between the harm alleged and the harm that the relief may cause the non-moving party and (4) the public interest.  Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No single factor is determinative.  Id. at 113.  Instead, the court considers the particular circumstances of each case, remembering that the primary question is whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  Id.

## I.   Likelihood of Success on the Merits

The court first considers the "most significant" Dataphase factor: likelihood that the movant will prevail on the merits.  S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992). Bison argues that it will succeed because defendants are engaging in activity clearly prohibited by the noncompete agreement, that is, pairs trading with an average daily turnover rate of 25 percent or more.  The court disagrees.

Noncompete agreements are not favored under Minnesota law because they operate as restraints of trade.  Medtronic, Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 456 (Minn. Ct. App. 2001). Such agreements are enforceable only to the extent reasonably necessary to protect a legitimate business interest.  Webb Publ'g Co. v. Fosshage, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988). "Legitimate interests ... include the company's goodwill, trade

6

secrets, and confidential information." Medtronic, 630 N.W.2d at
456.  The court may modify an unreasonable noncompete agreement,
enforcing it only to the extent that it is reasonable.  Davies &
Davies Agency, Inc. v. Davies, 298 N.W.2d 127, 131 n.1 (Minn.
1980); Bess v. Bothman, 257 N.W.2d 791, 794-95 (Minn. 1977).
Bison's interpretation of the agreement, prohibiting any trading
with an average daily turnover rate of 25 percent or more, is
unreasonable.  The agreement is only enforceable to the extent it
protects a legitimate business interest, such as prohibiting
defendants from using Bison's confidential information to engage in
trading with high turnover rates.

Bison alleges that Kessler and Goddard incorporated the
confidential models and algorithms developed at Bison into the
trading strategies implemented at Walleye.  Gildor Decl. ¶ 41;
Gildor Suppl. Decl. ¶ 29.  However, Bison provides nothing concrete
to support this allegation.  It points to the close tracking
between Bison and Walleye turnover rates and trading patterns that
started in 2013.  Gildor Decl. ¶ 40.  Defendants admit that trading
at Walleye became more systematized at that time, but attribute any
similarities to the incorporation of generic and widely available
software.  Kessler Decl. ¶¶ 45, 46; Gildor Decl. ¶¶ 58-60.
Defendants further state that the Walleye pairs traders do not have
access to Bison's confidential information.  Kessler Decl. ¶¶ 41,
47.  Because Bison speculates at this time that defendants used its

confidential information in violation of the noncompete agreement,
this <u>Dataphase</u> factor weighs against injunctive relief.[7]

## II. Irreparable Harm

To establish irreparable harm, "a party must show that the
harm is certain and great and of such imminence that there is a
clear and present need for equitable relief." <u>Iowa Utils. Bd. v.
F.C.C.</u>, 109 F.3d 418, 425 (8th Cir. 1996). "A mere possibility of
irreparable harm is not enough" to issue an injunction. <u>Superior
Edge, Inc. v. Monsanto Co.</u>, 964 F. Supp. 2d 1017, 1046 (D. Minn.
2013). "Irreparable harm occurs when a party has no adequate
remedy at law, typically because its injuries cannot be fully
compensated through an award of damages." <u>Gen. Motors Corp. v.
Harry Brown's, LLC</u>, 563 F.3d 312, 319 (8th Cir. 2009). The breach
of a noncompete agreement raises an inference of irreparable harm.
<u>Overholt Crop Ins. Serv. Co. v. Bredeson</u>, 437 N.W.2d 698, 701
(Minn. Ct. App. 1989).

Bison has not demonstrated a substantial likelihood of success
on the merits, indicating that irreparable harm is unlikely. At
this stage in the proceedings, however, the record is not developed
and "a decision on the merits" has not been rendered. <u>Hubbard
Feeds, Inc. v. Animal Feed Supplement, Inc.</u>, 182 F.3d 598, 603 (8th

---

[7] Defendants also argue that the noncompete is unenforceable
because it has either been superseded or waived. Because the court
finds that Bison has not shown a likelihood of success on the
merits even with an enforceable agreement, the court does not
consider these arguments.

Cir. 1999).  As a result, the court examines the potential harm alleged by Bison.  Bison argues that irreparable harm has occurred because the Operating Agreement expressly provides that such harm would result through its violation, and that the violation here has impacted Bison's profitability in a manner that is difficult to quantify.  The court disagrees.

While parties may agree contractually on the matter of irreparable harm, these agreements are not conclusive.  See VONCO V Duluth, LLC v. Saari, No. A13-0968, 2014 WL 103443, at *3 (Minn. Ct. App. Jan. 13, 2014); see also Allan Block Corp. v. E. Dillon & Co., No. Civ. 04-3511, 2005 WL 1593010, at *6 (D. Minn. July 1, 2005).  Apart from pointing to the Operating Agreement, Bison merely speculates that defendants' pairs trading activity has caused it harm.  Bison shows that Walleye's profits increased substantially after its trading became more automated, while Bison's profits decreased markedly during the same time frame. Gildor Decl. ¶¶ 44, 45; Gildor Suppl. Decl. ¶ 43.  However, Bison fails to connect its decline in profits to Walleye's trading.  See Travel Tags, Inc. v. UV Color, Inc., 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (finding no irreparable harm where plaintiff failed to link a decrease in profits to defendant's conduct and offered only unsupported statements that defendant's competition caused harm).

Even if Walleye's trading injured Bison, the court is not convinced that Bison could not be adequately compensated through

money damages.  Lost profits that are difficult to quantify may constitute irreparable harm.  <u>See</u> <u>Perkins v. City of St. Paul</u>, 982 F. Supp. 652, 655 (D. Minn. 1997); <u>Animal Fair, Inc. v. AMFESCO Indus., Inc.</u>, 620 F. Supp. 175, 191 (D. Minn. 1985).  Bison argues that its lost profits cannot be reasonably calculated because of the complexity of the strategies it uses and the difficulty in measuring the market disturbance caused by Walleye's trading.  Gildor Decl. ¶ 45, 46.  Defendants respond by setting forth common methods that they allege could be used to calculate damages to a reasonable degree of certainty.  Mayhew Decl. ¶¶ 9, 10, 18-40.  In light of this disagreement, the court finds that Bison has not met its burden of showing, at this time, that money damages would be difficult to quantify.  As a result, this <u>Dataphase</u> factor weighs against injunctive relief.

## III.  Balance of Harms

Under this factor, "a court should flexibly weigh the case's particular circumstances to determine whether ... justice requires the court to intervene to preserve the status quo."  <u>United Indus. Corp. v. Clorox Co.</u>, 140 F.3d 1175, 1179 (8th Cir. 1998) (citation and internal quotation marks omitted).  As explained above, Bison fails to show that it has suffered any harm due to Walleye's trading.  On the other hand, harm would likely be imposed on Walleye if the injunction is granted.

Defendants note that the salaries of Walleye's pairs traders are determined primarily by the profitability of their portfolios, which in part depends on turnover rates.  Kessler Decl. ¶ 22. Those traders regularly achieve turnover rates between 15 and 100 percent.  See, e.g., id. ¶ 20; Doshan Decl. ¶ 2; Klammer Decl. ¶ 7; Mickiewicz ¶ 4; Meenan Decl. ¶ 11; Schwieters Decl. ¶ 5.  Cutting those rates would affect profitability and likely cause the traders to leave Walleye.

Moreover, because the Walleye traders have long engaged in high turnover pairs trading, granting an injunction here would frustrate, rather than preserve, the status quo.  "When the status quo is one of business activity and the alternative of 'rest' causes irreparable harm, we have favored the activity."  Hill v. Xyquad, Inc., 939 F.2d 627, 631 (8th Cir. 1991).  As a result, this Dataphase factor weighs against injunctive relief.

## IV. Public Interest

Bison argues that there is a public interest in upholding contractual agreements.  The court agrees.  See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003) (noting that "the public interest would not be served by permitting a party to avoid contractual obligations.").  As explained above, however, Bison fails to show at this stage that defendants have breached the Operating Agreement.  There is also a public interest in encouraging competition.  See Calvin Klein Cosmetics Corp. v.

Lenox Labs., Inc., 815 F.2d 500, 505 (8th Cir. 1987).  Because there is no showing at this stage that defendants have engaged in unfair competition, this Dataphase factor weighs against injunctive relief.  As a result, based upon a balancing of the four Dataphase factors, the court determines that a preliminary injunction is not warranted.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction [ECF No. 12] is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 30, 2014

s/David S. Doty
David S. Doty, Judge
United States District Court