**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Bison Advisors LLC, a Minnesota limited liability company, Ephraim Gildor, and Argos Capital Management Inc.

          Plaintiffs,

    vs.

Irvin Kessler, Peter Goddard and Walleye Trading Advisors LLC, a Minnesota limited liability company,

          Defendants,

    vs.

Ephraim Gildor and Argos Capital Management Inc.,

          Counterclaim Defendants.

Court File No. 14-cv-03121 (DSD-SER)

**PLAINTIFFS' SECOND AMENDED AND SUPPLEMENTAL COMPLAINT AGAINST IRVIN KESSLER, PETER GODDARD, AND WALLEYE TRADING ADVISORS LLC**

**JURY TRIAL DEMANDED ON ALL ISSUES TRIABLE TO A JURY**

---

Plaintiffs Bison Advisors LLC, Ephraim Gildor, and Argos Capital Management Inc. for their Second Supplemental Complaint against Defendants Irvin Kessler, Peter Goddard, and Walleye Trading Advisors LLC, states:

## PARTIES

1.    Plaintiff Bison Advisors LLC ("Bison") is a limited liability company organized under the laws of the State of Minnesota with its principal place of business located at 10074 West 190th Place, Mokena, Illinois.  Exhibit 1 hereto is an accurate and complete copy of the Bison Operating Agreement, dated December 21, 2010, as signed

on or about December 21, 2010 by all initial Bison Members and/or their authorized representatives. Bison's sole current member is Plaintiff Argos Capital Management Inc. ("Argos"), a Delaware Chapter S Corporation whose principal place of business is 1280 South Ute Avenue, Aspen, Colorado. Plaintiff Ephraim Gildor ("Gildor"), an individual who is a citizen of Colorado, owns Argos. Gildor was an original member of Bison. Additionally, Gildor was a founding member of Axiom Investment Advisors LLC ("Axiom"). Axiom was an original member of Bison. Gildor signed the Bison Operating Agreement, Exhibit 1, as an individual Member of Bison and as the authorized representative of Axiom. Axiom was dissolved in 2013, and its interests in Bison were transferred to Argos Capital Management, Inc. ("Argos"). Subsequently, Gildor transferred his interest in Bison to Argos.

2.    Defendant Irvin Kessler ("Kessler") is a citizen and resident of the State of Minnesota. Kessler personally signed the Bison Operating Agreement, Exhibit 1, as an individual Member of Bison and on behalf of Bison as its sole Managing Member. Kessler was the sole Managing Member of Bison from at least as early as December 21, 2010 until at least the end of 2013.

3.    Defendant Peter Goddard ("Goddard") is a citizen and resident of the State of Minnesota. Goddard personally signed the Bison Operating Agreement, Exhibit 1, as an individual Member of Bison. Kessler was an individual Member of Bison from at least as early as December 21, 2010 until at least the end of 2013.

4.    Defendant Walleye Trading Advisors LLC ("Walleye") is a limited liability company organized under the laws of the State of Minnesota with its principal place of

2

business located in the State of Minnesota. Walleye's sole members are Goddard, Kessler, and upon information and belief, Christopher A. Welty, a citizen and resident of the State of New York, Mark Lyons, a citizen and resident of Minneapolis, Minnesota, and Ori Kushnir, a citizen and resident of Japan. Kessler is and since a time prior to 2010 has been the controlling Member of Walleye.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity as between the parties and their members.

6.      Personal jurisdiction by this Court over Defendants Goddard, Kessler, and Walleye is proper because each Defendant is a Minnesota citizen and resident.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in this district, a substantial part of the property that is the subject of this action is situated in this district, and each Defendant is a Minnesota citizen and resident.

8.      Personal jurisdiction and venue are also proper because the parties agreed in the Bison Operating Agreement to have disputes adjudicated in Minnesota and submitted to the venue and jurisdiction of this Court. (Exhibit 1 at §10.4.)

## SUMMARY OF CLAIMS

9.      Because the initial Bison Members were forming a new business in which they would each participate, Bison, an equity and commodities trading firm, decided that all of its Members, including Kessler and Goddard, should sign the Bison Operating

3

Agreement, which they in fact did. All Members were experienced in equity and commodity trading of various kinds prior to the formation of Bison and most, if not all, Members intended to continue certain equity and commodity trading during Bison's existence, to the extent such trading was permitted by the Bison Operating Agreement. To, among other things, assure the loyalty of the Members to Bison and to promote the Members' open disclosure and communication of proprietary information and expertise essential to the success of Bison, the Members agreed, with certain exceptions, that all equity and commodity trading within the scope of Bison's intended business, namely, "trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more" would be done by them jointly in Bison, and that no Member would, either directly or indirectly, engage in such activity outside of Bison. (Exhibit 1 at §6.4(a)(i)).

10. To reflect, and to provide for legal enforcement of, the Members mutual commitments, the Bison Operating Agreement contains a Noncompete Covenant among these fiduciaries that established an easily ascertainable, enforceable, and bright line between what the members of Bison could and could not do outside of Bison while they were affiliated with Bison and for a period of two years thereafter. (Exhibit 1 at §6.4.). The Members also mutually acknowledged and agreed that, by reason of their participation in Bison, they would have access to "proprietary, confidential and trade secret information of the Company [Bison] and its related and affiliated entities, including, but not limited to client and investors lists, systems, codes methods, pricing, strategies, procedures, software programs" and "other information which is unique to the

4

Company [Bison] or which derives independent economic value from not being generally known or readily ascertainable by proper means ("Confidential Information) (Exhibit 1 at §6.4(c))." The Members committed to one another and to Bison that no Member or former Member that has withdrawn shall, "at any time, directly or indirectly, disclose, furnish, make accessible to any person, firm, corporation, or other entity, or make use of, any Confidential Information obtained while a Member of the Company [Bison]. (Exhibit 1 at §6.4(c))." In short, everything developed by any Member or group of Members was and is exclusively owned by Bison.

11.    The Noncompete Covenant prohibited each Bison member from engaging in any trading strategy having "an average daily turnover of 25 percent or more" with specified exceptions. As expressly provided, Axiom and partners associated with Axiom are exempt from the 25% average daily turnover restriction if the trading activity related to "currencies." Additionally, as expressly provided, Walleye and partners associated with Walleye are exempt from the 25% average daily turnover restriction if the activity was trading "options and delta hedging strategies for options." (Exhibit 1 at §6.4(a)(i). The Noncompete Covenant further provides that if any member withdraws from Bison, the member is still bound by the terms of the Noncompete Covenant for two years after his/her withdrawal. (*Id.* at §6.4(a)(i), §10.8.) All of the members of Bison agreed to this covenant to protect each other's interests.

12.    In the Summer of 2014, Plaintiffs discovered that Kessler, Goddard and Walleye had been secretly and continuously utilizing Bison's proprietary and confidential information, since at least as early as mid-2013 and on information and belief, as early as

October 2012, to implement an equity trading strategy outside of Bison and not sharing the profits with Bison. That strategy resulted in an average daily turnover of 25% or more which also was prohibited by the Bison Operating Agreement, specifically the Noncompete Covenant. 'Defendants also improperly terminated Walleye's agreement to fund and execute Bison's trading strategies while refusing to timely provide Bison with the Bison data, database, and code that would have allowed Bison to have continued trading its strategies after Walleye ceased doing so.

13. This suit seeks injunctive relief to enforce the terms of the Noncompete Covenant and the restrictions on the use of Bison's confidential information. The suit further seeks damages including Bison's lost profits, Bison's diminution in value, and/or the profits and benefits that Kessler, Goddard, and Walleye have obtained through their wrongful conduct, including the use of Bison's Confidential Information.

14. In addition, Gildor and Argos seek damages, attorneys' fees and costs, and equitable relief from Kessler as and for Kessler's improper conduct as a member and as the managing member of Bison in violation of Minnesota's Limited Liability Company Act, Chapter 322B, Minnesota Statutes.

**BACKGROUND**

15. In 2003, Gildor founded Axiom, a hedge fund specializing in the quantitative, math-based and computer-executed trading of foreign currencies. Two highly acclaimed University Professors of Economics, both of whom were experts in the application of sophisticated mathematics to economic problems including equities and commodities trading, joined Axiom at its founding; one of the professors is Kevin

Murphy ("K. Murphy").  Lingling Wu, a Ph.D. physicist ("Wu"), turned financial quant, who had long worked with Gildor, also joined Gildor and K. Murphy at Axiom.  Axiom was consistently ranked among the best hedge funds in its category.

16.    From 2003 through 2013, the Axiom team developed and applied sophisticated, math-based and computer-executed trading strategies for foreign currencies involving a daily turnover of 25 percent or more.  Such high daily trading turnovers are characteristic of algorithmic, math-based trading strategies executed via a trader's high speed computers that are electronically connected to public exchanges, banks, and electronic communication networks (ECN).

17.    In 2010, Kessler approached Gildor with a proposal regarding the formation of a new business venture.  Kessler proposed that Gildor would contribute to the new venture his extensive skills, experience and expertise, and those of the members of the Axiom team including, among others, K. Murphy, Wu, and K. Murphy's son, Chris Murphy ("C. Murphy").  The business of the new venture, which came into being as Bison, was the creation and development of quantitative, math based and computer executed equity and commodity trading strategies of a kind characterized in the Bison Operating Agreement Section 6.4(a)(i) as having "a daily turnover of 25 percent or more."

18.    Gildor had known Kessler for decades, and Gildor placed great trust and confidence in Kessler.

19.    Bison's initial Class A members were: (1) Irvin Kessler; (2) Peter Goddard; (3) Ephi Gildor; (4) Kevin Murphy; (5) Chris Murphy; and (6) Lingling Wu, who were

7

collectively entitled to 20% of Bison's profits. (Exhibit 1 at §4.1 (a)).  Bison's initial Class B members were: (1) Ori Kushnir; (2) Axiom; (3) Irvin Kessler; (4) Peter Goddard; and (5) Mark Lyons, who were collectively entitled to 80% of Bison's profits. (*Id.*)

## BISON'S TECHNOLOGY

20.     Prior to Bison's formation, Gildor created, and successfully employed, both through Axiom and personally, mathematical models for computer-executed mean reversion trading strategies having an average daily turnover of 25 percent or more. These strategies were the predecessors for the pairs trading strategies employed at Bison.

21.     Gildor contributed that knowledge to Bison at the time of Bison's formation, along with other valuable technology for the math based, computer trading of equities and commodities with an average daily turnover of 25 percent or more.  The contributed technology included, among other things, novel methods for multi-period optimization, risk management, and the control of slippage associated with execution.

22.     At the time Bison was formed, the Axiom team was recognized by the other Bison members as the intended dominant source for the technology and for creation of Bison's trading strategies.  The Axiom team was the primary, and near exclusive, source of Bison's proprietary trading strategies.

23.     At Bison, the Axiom team developed many novel trading techniques including models for selecting well-matched pairs to be traded, methods for limiting the impact associated with the release of news, algorithms for establishing new pairs positions and exiting existing pairs positions based on historical returns, models to limit risk for the pairs being traded based on market volatility, methods for scaling positions

and entry and exit points based on the volatility of the pairs and the market as a whole, and methods for scaling the weighting of pairs based on past performance. Such novel technology is, in part, the basis for Bison's pairs trading strategies.

24. The Axiom team developed the proprietary model that would become Bison's pairs-trading strategy. Trading on Bison's strategies started in the last quarter of 2011.

25. Bison's trading since its inception mostly has been, and continues to be, pairs trading with a daily turnover of 25 percent or more. Bison trades daily many millions of shares.

26. Given the high trading turnover and volume, other traders using the same or similar strategies adversely impacts Bison's financial performance.

## BISON'S OPERATING AGREEMENT

27. Kessler, the most senior and most experienced businessperson among the Bison participants, took the lead in defining the business relationship among the Bison participants. Kessler, through his legal counsel at a Minneapolis law firm, drafted the Bison Operating Agreement.

28. Kessler worked with his lawyer to make changes to the Operating Agreement.

29. Kessler and Goddard presented the versions of the Bison Operating Agreement to Gildor, K. Murphy, and other members for review. On information and belief, Goddard presented the final version of the Operating Agreement for final review and execution.

30. The Bison Operating Agreement, as originally drafted and as presented to the members for execution, included a non-compete provision. The non-compete provision was the subject of specific communications between Kessler, K. Murphy and Gildor. Moreover, an early version of the non-compete provision was specifically changed to restrict trading activity measured in terms of turnover rates. Thereafter, certain specified trading activities were included as exemptions from the scope of the non-compete.

31. To establish an easily enforceable, bright line between what the members of Bison could and could not do outside of Bison while they were affiliated with Bison and for a period of two years thereafter, the members of Bison (including Kessler and Goddard) agreed to a covenant not to compete; each member memorialized and formalized his/her agreement to the covenant by signing the Bison Operating Agreement. Section 6.4 of Bison's Operating Agreement provides:

6.4     Noncompete

(a)     During the period of time that any Person is a Member of the Company and for two (2) years after the date of withdrawal or removal of a Member, such Person will not directly or indirectly as a principal, agent, owner, employee, consultant, trustee, beneficiary, distributor, partner, co-venturer, officer, director, stockholder or in any other capacity:

(i)     engage in, have an interest in or become associated with any entity, firm, business, activity or enterprise which trades or plans on trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more. Specifically currencies are excluded for Axiom and partners associated with Axiom, and options and delta hedging strategies for options are excluded for Walleye and partners associated with Walleye.

(referred to as the "Noncompete Covenant") (Exhibit 1 at §6.4.)

10

32. Additionally, Section 6.4 of Bison's Operating Agreement also includes a covenant acknowledging the existence of Bison's proprietary and confidential information and restricting the disclosure and use of such information ("Confidential Information Covenant"). (Exhibit 1 at §6.4(c).)

33. All Bison members signed the Bison Operating Agreement.

**PERFORMANCE OF BISON AND WALLEYE**

34. During Bison first full year of trading in 2012, Bison dramatically outperformed the Walleye's pair traders. Bison realized a net profit of $13.3 million during calendar year 2012. In contrast, Walleye pair traders had a net profit of only $1.4 million. Observing the relative performance of Bison and Walleye pair traders during 2012, Goddard, requested and obtain from Bison significant confidential and propriety information regarding the Bison trading strategies, and began to use, reconstruct and refine those strategies within Walleye in an attempt to improve the performance of the Walleye pair traders. By secretly and wrongfully misappropriating Bison's Confidential Information in violation of the Bison Operating Agreement, the Walleye pair traders dramatically increased their profitability in the second half of 2013 and during the first half of 2014, all as then unknown to plaintiffs. In addition to an unlawful misappropriation of Bison's Confidential Information, Defendants' equity and commodity trading was expressly prohibited by Section 6.4(a)(i) of the Agreement. In 2013, the Walleye pair traders more than doubled their net profits to $3.3 million, and in 2014, the net profits increased to $4.4 million.

11

## CHANGES AT AXIOM AND BISON

35.     By mid-2013, Axiom stopped trading and thereafter started to shut down. Argos, another company formed by Gildor, was eventually substituted as a member of Bison in place of Axiom and Gildor personally.

36.     In the fall of 2013, Kessler and Goddard purported to withdraw as members from Bison but wanted to continue their relationship with Bison in which Walleye would continue to provide trading capital for Bison and would effectuate Bison's trading strategies.

37.     At the time of their purported withdrawal from Bison and based upon Goddard, Kessler, and Walleye's fraudulent and material affirmative misrepresentations and omissions to plaintiffs as further described below, Bison, Goddard, Kessler, and Walleye entered into an understanding regarding the sharing of profit and salary on a going forward basis ("the Profit and Salary Understanding").  Pursuant to the Profit and Salary Understanding, as of July 2013:

- 49.6% of Bison's profits would go to Walleye;

- 50.4% of Bison's profits would go to C. Murphy, Wu and Bison (which, pursuant to the Profit and Salary Understanding, was owned by Argos and K. Murphy);

- C. Murphy's (6.624% of profits) and Wu's (6.624% of profits) were to be paid through Walleye; and

- K. Murphy, C. Murphy, Wu, Gildor, Kessler, and Goddard were to be the team going forward that was to operate to make Bison successful.

38.     The Profit and Salary Understanding was intended to be similar in "spirit" to the financial arrangement under the Bison Operating Agreement, and permitted

Goddard to have access to Bison's information, technology, confidential information, and trade secrets in order to effectuate Walleye's assistance with the continued improvement of Bison's pairs trading operation, for which assistance Walleye was to be compensated pursuant to the terms of the Profit and Salary Understanding.

39.     From the fall of 2013 through November 7, 2014, Bison continued to implement its trading strategies.  During this same period, Kessler, Goddard, and Walleye continued to fund and execute Bison's trades.  During this time period, Kessler, Goddard and the members of Bison continued to receive profit participation percentages. Kessler continued as the sole Managing Member of Bison and Goddard continued as a Member of Bison until the end of 2013;  Kessler also signed Bison's 2013 tax return on behalf of Bison.  In fact, Defendants represented in writing to the Secretary of State of Minnesota in November 2013 that one of Walleye's employees was the registered agent of Bison and that the offices of Bison were then at the same address as Walleye.  The Profit and Salary Understanding did not alter the mutual obligations of the Members to one another or to Bison under the Bison Operating Agreement, including specifically the obligations imposed by Section 6.4.

40.     The execution system used by Walleye to effectuate Bison's trades was initially developed by Goddard, Wu, K. Murphy and C. Murphy and in 2014 was improved by K. Murphy, C. Murphy, Wu, Gildor and Will England.  The execution system as so developed by Members of Bison is the exclusive property of Bison.  On information and belief, Walleye had no execution system for pairs trading prior to the formation of Bison.

## KESSLER AND GODDARD OPERATE WALLEYE
## IN VIOLATION OF THE BISON OPERATING AGREEMENT

41.    Unbeknownst to Gildor, K. Murphy, and Bison, when Kessler and Goddard were purporting to withdraw as Bison members, Kessler, Goddard, and Walleye were breaching the Noncompete Covenant, their fiduciary duties, defrauding Bison, tortiously interfering with Bison, and misappropriating Bison's confidential information and trade secrets.   On information and belief, Defendants wrongful conduct began long before Kessler and Goddard sought to withdraw as members in Bison.  Indeed, plaintiffs believe that Kessler and Goddard intended, at the time Bison was formed in December, 2010 or certainly within 18 months thereafter, to secretly and fraudulently misappropriate Bison's Confidential Information.

42.    Kessler and Goddard, through Defendant Walleye, wrongfully engaged in equity trading strategies for their own account post-December 27, 2011 that had "an average daily turnover of 25 percent or more" in clear violation of the Noncompete Covenant. (Exhibit 1 at §6.4(a).)  'By the middle of 2013, Walleye's average daily turnover was roughly 50% and closely matched Bison's turnover. Walleye's trading strategies at issue did not include options or delta hedging strategies for options that were exempted from the Noncompete Covenant.  By 2014, Walleye's 21-day average daily turnover was very similar to Bison's average daily turnover.  The matching and tracking turnover rates show Defendants' misappropriation and other misuse of Bison's confidential and proprietary information.

14

43. The contractual prohibition against engaging in trading strategies that have a daily turnover of 25 percent or more continues for two years after a member of Bison withdraws. (Exhibit 1 at §6.4(a).)

44. Prior to June 2014, Bison was unaware that Kessler, Goddard, and Walleye were using Bison's Confidential Information to engage in pairs trading that violated the Noncompete Covenant.'

45. Pairs trading strategies track the prices of two historically correlated equities. When equities diverge, a pairs trader buys the equity whose price has lagged and sells the equity whose price has risen, thus betting that the historical correlation will return. Successful pairs trading requires optimal position sizing and market timing.

46. In late June 2014, Bison determined that Walleye had been (1) using an exponential moving average ("EMA") pairs trading model in a way that was very similar to the way in which Bison used the model; and (2) using a price ratio based parallelogram as a means to trade more systematically that closely mimicked the way in which Bison had using a parallelogram.

47. Walleye was able to acquire detailed confidential information regarding Bison's trading strategies through Goddard and Kessler's membership in Bison. In particular, Goddard gained such information through discussions and emails with Wu, C. Murphy, and K. Murphy. At the time of these discussions, Wu, C. Murphy, and K. Murphy were unaware that the information would be wrongfully used to copy Bison's trading strategies and to wrongfully implement a competing pairs trading business in violation of the Bison Operating Agreement.

48.    Specifically, Defendants, principally through Goddard, repeatedly assured Plaintiffs that Defendants were accessing, requesting and reverse-engineering Bison's confidential trading strategies for the ostensible reason of furthering the interests of Bison. Examples include the following statements and questions from Goddard to Bison (Chris Murphy and Lingling Wu, unless otherwise noted):

a.    The first thing I'd like him to do is to be 'productionize the Walleye simulator' and expand it to use the matrix-idea of speed/ width

\* \* \* \*

So, given a pair can you tell me the math you use to establish the trading parallelograms please? Are they EMA;s [sic] or some sort of other decay, etc.

(Exhibit 2, April 25, 2012 email from Goddard to Chris Murphy and Lingling Wu).

b.    I see the division of labor that Yao and I own as:

Serve as a prototype research shot for improvements not related to picking the actual pairs. If we find something, then you guy [sic] would go mock it up or real and see if we're right. Be critical of what you guys do (-- productively, not just to be a wanter). Put ideas into your hopper.

(Exhibit 3, April 27, 2012 email from Goddard to Chris Murphy and Lingling Wu).

c.    Yao and I are trying some stuff out… but it'd be helpful to have your formula. Care to assist my reverse engineering effort?

(Exhibit 4, May 1, 2012 email from Goddard to Chris Murphy and Lingling Wu).

d.    Yao has been working only on Bison since we last spoke, me in-and out of it as you'd expect. We've been discussing results and adjusting direction often.

We have been hitting our head on the wall looking for improvements. My joy-meter on results is kind of low-to - medium, though we are a bit enthusiastic today.

Perhaps just a local high.

16

(Exhibit 5, June 27, 2012 email from Goddard to Chris Murphy and Lingling Wu).

   e.    When you have time, can you please forward me your intraday mean reversion grid … and the spreadsheet summarizing all those simulations you ran please?

(Exhibit 6, August 28, 2012 email from Goddard to Chris Murphy and Lingling Wu).

   f.    Friction costs, execution methods, and book-scaling are wed to one another.  We'll find the right way forward as a group; I'll simply organize my point of view.

(Exhibit 7, January 9, 2013 email from Goddard to Chris Murphy and Lingling Wu).

   49.   Defendant Kessler similarly assured Bison that the goal of their collaboration was to benefit Bison.  For example, on February 7, 2013, Kessler emailed Kevin Murphy:

   What the next step for bison.  I posit that Kevin et al spending a lot more time on pairs is not the best use of resources.  I also think (hopefully we all agree), that bison has been a good collaboration, not just in terms of PNL but also in terms of everyone bringing something to the table and working well together to create something more than we could have done independently.  If everyone agrees with [six] these premises we should think about the next chapter for bison.  So, I want us to think, as a group, what our strength [sic] are and what we could work on that could maximize the value of Bison.

(Exhibit 8, February 7, 2013 email from Kessler to Kevin Murphy).

   50.   Defendants continued to dissemble even after Bison confronted them about the real purpose of Defendants' purported "collaboration" and "assistance." For example, during a face-to-face meeting of the parties on June 18, 2014 at Bison's office in Mokena, Illinois, Goddard asserted that his efforts to obtain and reverse-engineer Bison strategies was to help Bison:  "We did that as a good partner of Bison."

17

51. In June-July 2014, based on an analysis of Walleye trading turnover, it became clear that Kessler, Goddard, and Walleye had been engaging in, and were continuing to engage in pairs trading that violated the Noncompete Covenant and as well improperly used Bison's confidential information and trade secrets.

52. At a meeting at Bison's office in Mokena, Illinois on June 18, 2014, Kessler admitted to Gildor and K. Murphy that Walleye did engage in trading strategies that have an average daily turnover of 25 percent or more while he and Goddard were Members of Bison and that Defendants had continued to do so without interruption. When told during the meeting that the Bison Operating Agreement expressly prohibited such conduct, Kessler defiantly stated that he did not care what the contract said. Defendants conduct in violating the Bison Operating Agreement and Defendants' misappropriation of Bison's confidential information was malicious and willful.

53. Kessler and Goddard, as members of Bison, owed fiduciary duties to Bison and its members. And, in his role as Bison's sole managing member, Kessler owed additional and heightened fiduciary duties to Bison and its members.

54. While Kessler and Goddard were members of Bison and while Kessler was Bison's managing member, they breached their fiduciary duties to Bison by, *inter alia*, engaging in non-exempted equity trading strategies that had an average daily turnover of in excess of 25 percent in violation of the Noncompete Covenant, by utilizing a pairs trading model that mirrored the model developed and utilized by Bison, improperly using Bison's confidential and proprietary information, and by operating a prohibited and competing pairs trading business that traded with a turnover in excess of 25%.

18

55.    At the time they purported to withdraw from Bison, Kessler and Goddard did not inform Bison that: (1) they had been violating the Noncompete Covenant; (2) they (through Walleye) had been using Bison's confidential information and trade secrets; and (3) they intended to continue their misconduct.

56.    Walleye has wrongfully used Bison's confidential information and trade secrets in its business, which improperly competes with Bison.

57.    As late as early June 2014, Gildor, C. Murphy, Wu and K. Murphy were working with Will England ("England"), who had become an employee of Walleye in 2013, but was being paid by Bison to improve the Bison pairs trading model, without knowledge that Walleye was violating the Noncompete Covenant, and thus improperly competing with Bison, and using Bison's confidential information.

58.    If Bison had known Kessler, Goddard, and Walleye were violating the Noncompete Covenant, Bison would not have entered into any arrangement with Kessler, Goddard or Walleye that permitted them to have any access to Bison's confidential information or trade secrets.  But for the fraud and concealment of Defendants, Bison would not have entered into the Profit and Salary Understanding, and would have instead terminated its relationship with Defendants, nor would Bison have refunded Goddard and Kessler's investment in Bison.

59.    In retaliation for plaintiffs' insistence that Defendants honor the Bison Operating Agreement, Defendants, on or about August 5, 2014, threatened to cease providing capital and trade execution for Bison, all without  providing Bison with sufficient opportunity to make alternative arrangements to continue its trading strategies.

This threat, which they carried out, significantly harmed Bison and diminished its growth, profitability and value.  Indeed, Bison was unable to trade for months because of such wrongful conduct and as a consequence Bison lost millions in potential profits. Defendants engaged in such conduct with deliberate and malicious intent to injure Bison, and to wrongfully coerce plaintiffs into foregoing their legal and equitable claims against Defendants.  Bison is entitled to damages from Kessler, Goddard, and Walleye because of their violation of Noncompete Covenant and restrictions on the use of Bison confidential information.  Indeed, Kessler and Goddard formally and contractually agreed that the Noncompete Covenant was reasonable and necessary to protect the legitimate interests of Bison, that Bison would suffer irreparable harm if they breached the Noncompete Covenant, and that Bison would be entitled to damages and injunctive and other equitable relief to enforce the restrictions contained in Section 6.4 of the Operating Agreement.  (Exhibit 1 at §§6.4(b), 6.4(d).)  Further, Kessler and Goddard, as fiduciaries, formally "waiv[ed] the claim or defense that [Bison] has an adequate remedy at law." (Exhibit 1 at §10.12.)

### UNDER THE PARTIES AGREEMENT, WALLEYE WAS REQUIRED TO FUND AND EXECUTE BISON'S TRADING STRATEGIES

60.     Bison created an extensive database that was used to implement its trading strategies.

61.     In 2013, Defendants requested that Bison transfer its database to the Walleye database (a transfer that took months), ostensibly for the singular purpose of advancing the business interests of Bison.  Thereafter, Bison did not maintain its

20

database, but instead trusted and relied upon Defendants to do so, as plaintiffs then believed Defendants were loyal to Bison. But for the Defendants wrongful conduct, Bison would not have transferred its database to Walleye.

62. As noted above, Bison and Defendants agreed that Walleye would execute and fund Bison's trades in exchange for Bison's agreement to give Walleye agreed-upon compensation. Throughout the parties' relationship, the amount and formula for determining Walleye's compensation changed. In the Fall of 2013, the percentage of Bison's profits paid to Defendants changed when the parties discussed changes to Bison's ownership and business structure.

63. At all times through November 7, 2014, Bison's trades were funded and executed by Walleye.

64. At all times, Walleye received the agreed-upon compensation for Bison's use of its capital to fund Bison's trades and for its services in executing Bison's trades.

**WALLEYE PROMISED TO ACT IN GOOD FAITH AND PROVIDE A SMOOTH TRANSITION REGARDING THE EXECUTION AND FUNDING OF BISON'S TRADES AND BISON RELIED UPON THE PROMISE**

65. By email on August 5, 2014, Walleye stated to Bison that Walleye would cease funding and executing Bison's trades as of the close of business on October 31, 2014. Walleye represented that during the interim time period, it would "work in good faith to transition service and support away from Walleye…" and that Walleye would provide Bison a "smooth transition" from the Walleye-facilitated trades and funding that the parties had long used. Bison reasonably relied upon these promises.

21

66.     Defendants knew, or should have known, that it would take many months for Bison to be able to transition from the parties' agreement and practice of Walleye funding and executing Bison's trades and that such transition depended upon Defendants timely providing Bison its data, database, and code.  As Defendants knew, Bison needed its data, database, and code in order to start building an execution system, running simulations, and performing other tasks that would be necessary before Bison could begin executing trades without Walleye.  Additionally, Defendants knew that such process take numerous months after Bison received from Walleye the Bison data, database, and code.

67.     In order to comply with its promises, Defendants were required to promptly provide Bison the code, data, and database relating to Bison's trading strategies.  The timely and complete provision of such information was needed to transition the funding and trading of Bison's strategies from Walleye to Bison or a third party.

68.     Maliciously and without justification, Defendants did not promptly provide the Bison data, database, and code, and never provided the execution code.

69.     Bison repeatedly requested that Defendants provide Bison with the Bison data, database, and code.

70.     Despite Bison's requests, and in breach of its promises and obligations, Defendants maliciously and without justification refused and otherwise failed to timely provide Bison with Bison's data, database, or code, and never provided the execution code.

22

71.     Despite knowing that its refusal and failure to timely provide Bison with Bison's data, database, and code meant that neither Bison nor another third party would be able to continue Bison's trading strategies, Defendants maliciously and without justification caused Walleye to terminate the funding and execution of Bison's trades as of the close of business on November 7, 2014.

72.     In November 2014 Defendants belatedly provided Bison with a copy of a portion of the Bison data, database, and code, but never provided the execution code. Without the consent or agreement of Bison, Walleye retained a copy of Bison's data, database, code, historical results and related information.  Walleye's retention of this confidential and proprietary information is illegal and in violation of Defendants' fiduciary obligations to Bison.  On information and belief, Defendants are using the aforesaid Bison confidential and proprietary information for at least pairs trading, all in deliberate and wrongful violation of their fiduciary obligations to plaintiffs.

73.     Because Defendants failed to, and otherwise refused to, timely provide Bison with the data, database, and code relating to its trading strategies, Bison was unable to continue to implement its trading strategies—and was required to shut-down its trading strategies—as of the close of business on November 7, 2014.

74.     As a result of Defendants' refusal to timely provide Bison the data, database, and code, Bison has suffered damages for which Defendants are responsible.

75.     Walleye, as a competitor of Bison with respect to pairs-trading and high average daily turn-over strategies, has benefitted and profited from Bison's absence from the market.

## COUNT I
### (Breach of Noncompete Covenant against all Defendants)

76.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-75.

77.   Kessler and Goddard are signatories to the Bison Operating Agreement, which was supported by valid consideration, and are bound by its terms.  (Exhibit 1.)

78.   Plaintiffs have fully performed all of their obligations under the Bison Operating Agreement.

79.   The Noncompete Covenant was agreed to by parties entering a business endeavor and was reasonable and necessary to protect Bison's legitimate business interest.  It prevents Kessler and Goddard from having "an interest in or become associated with any entity, firm, business, activity or enterprise which trades or plans on trading equity or commodity markets with a strategy that has an average daily turnover of 25 percent or more" except as expressly provided.  (Exhibit 1 at §6.4.)

80.   Kessler and Goddard have breached the Noncompete Covenant contained in the Bison Operating Agreement because Walleye's pairs trading strategy has an average daily turnover of 25 percent or more.

81.   Because Kessler and Goddard used Walleye, an entity they own and control, as an instrumentality to breach the Noncompete Covenant, Walleye is also liable for the contractual breach.

82. Plaintiffs have been, and will continue to be, irreparably harmed by Defendants' breach of the Noncompete Covenant and related provisions in the Bison Operating Agreement, and plaintiffs are without a complete and adequate remedy at law.

83. Plaintiffs have been, and will continue to be damaged as a result and proximate cause of Kessler and Goddard's breach of their obligations under the Noncompete Covenant. The amount of damages suffered by Bison as a result of Defendants' breach of the Bison Operating Agreement is not presently ascertainable, but exceeds $75,000.

## COUNT II
### (Breach of Confidential Information Covenant against all Defendants)

84. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-83.

85. Kessler and Goddard are signatories to the Bison Operating Agreement, which was supported by valid consideration, and is a valid and binding agreement. As signatories, Kessler and Goddard are bound by its terms. (Exhibit 1.)

86. Bison has fully performed all of its obligations under the Bison Operating Agreement.

87. Kessler and Goddard, as fiduciaries of Bison, agreed that Bison would have, and had, proprietary and confidential information, and that they were restricted, directly and indirectly, from using or disclosing such information that they obtained while a member of Bison thereafter until such time as Bison was dissolved. (Exhibit 1, at §6.4(c).)

25

88.   Kessler and Goddard violated this obligation by, inter alia, providing, disclosing, or allowing Walleye to use Bison's proprietary and confidential information.

89.   Plaintiffs have been, and will continue to be, irreparably harmed by Defendants' breach of the Confidential Information Covenant and related provisions in the Bison Operating Agreement.  Plaintiffs are without a complete and adequate remedy at law.

90.   Plaintiffs have been, and will continue to be damaged as a result and proximate cause of Kessler and Goddard's breach of their obligations not to use or disclose Bison's proprietary and confidential information.  The amount of damages suffered by Plaintiffs as a result of Defendants' breach of the Bison Operating Agreement is not presently ascertainable, but exceeds $75,000.

91.   Because Kessler and Goddard used Walleye, an entity they own and control, as an instrumentality to breach the Noncompete Covenant, Walleye is also liable for the contractual breach.

## COUNT III
### (Breach of Duty of Loyalty and Fiduciary Duties and Violations of Minnesota's Limited Liability Act against Goddard and Kessler)

92.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-91.

93.   As members of Bison, Kessler and Goddard owed Bison and its members fiduciary duties and duties of loyalty, good faith and fair dealing.

94.   While he served and otherwise functioned as Bison's sole managing member, Kessler owed Bison and its members heighted fiduciary duties as set forth in

26

Minnesota's Limited Liability Act, Chapter 322B, including Minnesota Statutes § 322B.69 which requires the manager to "discharge the duties of an office in good faith, in a manner the manager reasonably believes to be in the best interest of the limited liability company," and as further provided in Minnesota case law. .

95.     Kessler and Goddard breached their fiduciary duties and duties of loyalty, good faith and fair dealing to Bison by:  (1) violating the Noncompete Covenant and by failing to disclose such fact to Bison and by intentionally concealing such fact from Bison and its other Members; (2) running a competing business in violation of the Noncompete Covenant; (3) misusing Bison's information, technology, confidential information, and trade secrets for the benefit of their competing business in violation of the Confidential Information Covenant and applicable Minnesota law; and (4) entering into agreements with Bison and affiliated persons at the time they withdrew from Bison, for the purpose and with the intent to deliberately deceive, financially injure and  otherwise wrongfully disadvantage Bison, with malicious intent and without disclosing their conflict of interest in entering into these agreements. But for Defendants' wrongful conduct which it concealed from Bison, Bison would never have entered into such agreements.

96.     As a result and proximate cause of Goddard and Kessler's breaches of their fiduciary duties and duties of loyalty, good faith and fair dealing owing to Plaintiffs, Plaintiffs have suffered damages and continue to suffer damages, including that: (1) Bison's information, technology, confidential information, and trade secrets have been wrongfully misappropriated and used by a competitor, namely, Walleye; (2) Goddard and Kessler improperly used information belonging to Gildor and/or Argos for their benefit

27

and to the detriment of Gildor and Argos; (3) Bison was deceived into effectively funding the start-up costs of a competitor; and (5) Bison was deliberately misled and deceived to cause it to enter into the Profit and Salary Understanding that permitted Walleye, Goddard, and Kessler to continue to have access to Bison's confidential information, and trade secrets after Goddard and Kessler purportedly withdrew from Bison, which Bison would not have done had it known the true facts.

97.    The amount of damages suffered by Plaintiffs as a result of Defendants' wrongful conduct is not presently ascertainable, but exceeds $75,000.

98.    In addition, as a result and proximate cause of Goddard and Kessler's breaches of their fiduciary duties and duties of loyalty to Plaintiffs, Plaintiffs have suffered, and continue to suffer, irreparable harm for which injunctive relief is necessary and appropriate.

**COUNT IV**
**(Gildor and Argos' Claim against Kessler**
**Pursuant to Minnesota Statutes § 322B.38)**

99.    Gildor and Argos incorporate by reference the allegations contained in Paragraphs 1-98.

100.    When a member of a limited liability company seeks relief for a manager or governor's violation of a provision of the Limited Liability Act, Minnesota Statutes § 322B.38 authorizes a court to "grant any equitable relief it considers just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements…."

101.    For the reasons stated above, Kessler, acting as the managing member of Bison, failed to "discharge the duties of an office in good faith, in a manner the manager

reasonably believes to be in the best interest of the limited liability company," Minnesota Statutes § 322B.69.

102. As and for a remedy for Kessler's violation of Minnesota Statutes § 322B.69, Gildor and Argos request that be enjoined from using any of the confidential information that Axiom provided to Bison and to which Kessler had access and took, and for any profits Kessler obtained from using such information.

103. Additionally, as provided by statute, Gildor and Argos seek recovery of their expenses, attorneys' fees, and disbursements.

## COUNT V
### (Aiding and Abetting a Breach of
### Fiduciary Duty And Duty of Loyalty against Walleye)

104. Bison incorporates by reference the allegations contained in Paragraphs 1-103.

105. At all relevant times, Walleye was owned and controlled by Kessler and Goddard and accordingly, Walleye was fully aware of Kessler and Goddard's fiduciary breaches of their duties owing to plaintiffs.

106. Walleye substantially assisted Kessler and Goddard in committing their fiduciary breaches as Walleye was the entity through which Kessler and Goddard were operating when they violated the Noncompete Covenant and through which Kessler and Goddard implemented a trading strategy that improperly utilized Bison's proprietary and confidential information, technology, and trade secrets.

107. As a direct and proximate result of Walleye's aiding and abetting of the breaches in the fiduciary duties by Kessler and Goddard, Bison has suffered, and

29

continues to suffer, irreparable harm unless and until Defendants are enjoined from engaging in further misconduct and profiting from their past misconduct.

108. As a further direct and proximate result of Walleye's aiding and abetting of the breaches in the fiduciary duties by Kessler and Goddard, Bison has suffered, and continues to suffer, damages in an amount that is not presently ascertainable, but exceeds $75,000.

**COUNT VI**
**(Fraud against Kessler and Goddard)**

109. Bison incorporates by reference the allegations contained in Paragraphs 1-108.

110. As members of Bison from 2010 to September 2013, Kessler and Goddard owed Bison fiduciary duties.

111. Kessler and Goddard committed fraud by: (1) failing to disclose and in fact concealing the fact that they were violating the Noncompete Covenant; (2) running a competing business in violation of the Noncompete Covenant; (3) misusing Bison's proprietary and confidential information, technology, and trade secrets for the benefit of their competing business and to the detriment of Bison; (4) entering into the Profit and Salary Understanding with Bison and affiliated persons without disclosing their true and wrongful intent and conflicts of interest in entering into these agreements; and (5) requesting, accessing and reverse engineering Bison's confidential trading strategies under the guise of assisting Bison, all for the purpose and with the intent of deliberately misleading and defrauding Bison.

112.   Bison reasonably relied on the ostensible facts, which were material to Bison, that Kessler and Goddard: (1) were not violating the Noncompete Covenant; (2) were not running a competing business in violation of the Noncompete Covenant; (3) were not misusing Bison's proprietary and confidential information, technology, and trade secrets for the benefit of a competing business; and (4) were in all respects acting honestly and in good faith at the time they induced Bison to enter into the Profit and Salary Understanding.   In fact, Kessler and Goddard were acting dishonestly for the purpose and with the intent of deliberately misleading and defrauding Bison.

113.   As a result and proximate cause of Goddard and Kessler's fraud, Bison has suffered damages and continues to suffer damages, including that: (1) its proprietary and confidential information, technology, and trade secrets have been used by a competitor; (2) Bison has effectively funded the costs of a competitor, namely, Walleye, to the benefit of Walleye and the detriment of Bison; (3) the value of Bison has been diminished by the Defendants' conduct, and (4) Bison was induced by Defendants' wrongful concealment and deception to enter into understandings which permitted Walleye, Goddard and Kessler to continue to have access to Bison's proprietary and confidential information, technology and trade secrets after Goddard and Kessler withdrew from Bison, all because plaintiffs reasonably believed that Defendants were acting honestly and in the best interests of Bison.

114.   The amount of Bison's damages is not presently ascertainable, but exceeds $75,000.

31

## COUNT VII
### (Tortious Interference with a Contractual Relationship against Walleye)

115.    Bison incorporates by reference the allegations contained in Paragraphs 1-114.

116.    Kessler and Goddard agreed to all provisions of the Bison Operating Agreement, including the Noncompete Covenant contained in Section 6.4.

117.    Kessler and Goddard agreed not to use or disclose Bison's proprietary and confidential information as set forth in Bison's Operating Agreement.

118.    Walleye was aware that Kessler and Goddard were contractually obligated to abide by the Noncompete Covenant and were contractually restricted from improperly using or disclosing Bison's proprietary and confidential information.

119.    Walleye intentionally and unjustifiably procured Kessler and Goddard's breach of the Noncompete Covenant and the Confidential Information Covenant and other related provisions of Bison's Operating Agreement without justification

120.    As a result and proximate cause of Walleye's tortious interference, Bison has suffered damages and continues to suffer damages, including incurring attorneys' fees and litigation costs, and including damages that its proprietary information, technology, confidential information, and trade secrets have been used by a competitor, and that Walleye has been able to wrongfully compete against Bison.

121.    Bison has been, and will continue to be, irreparably harmed by Walleye's tortious interference as described above, and is without a complete and adequate remedy at law.

122.   The amount of Bison's damages is not presently ascertainable, but exceeds $75,000.

## COUNT VIII
### (Misappropriation of Confidential Information against all Defendants)

123.   Bison incorporates by reference the allegations contained in Paragraphs 1-122.

124.   Bison has confidential information, which information may not constitute a "trade secret" under applicable trade secret laws, but which is nevertheless protected by law.

125.   As Defendants acknowledged, Bison's "systems, codes, methods, pricing strategies, procedures, software programs, and any other information which is unique to the Company or which derives independent economic value from not being generally know or readily ascertainable by proper means" are confidential. (Exhibit 1 at §6.4(c).)

126.   The confidential information and technology Bison utilizes in connection with its pairs trading, constitutes its methods, pricing strategies, procedures, and is not generally known or readily ascertainable.

127.   The confidential information and technology Bison utilizes in connection with its pairs trading has tremendous economic value.  Indeed, without its pairs trading information and technology, Bison would lose the advantages it has over its competitors, including Walleye, in terms of when to place trades and speed of execution.

128.   Bison exercised reasonable efforts and took reasonable precautions to protect the secrecy of its confidential information under the circumstances.  Bison has

endeavored to keep its pairs trading information and technology confidential, including by requiring members of Bison to sign the Noncompete Covenant and by limiting the access that various employees have to the information and technology. Indeed, prior to September 2013, only Gildor, C. Murphy, Wu, K. Murphy, Kessler, and Goddard had access to the information and technology. After the Profit and Salary Understanding, the same persons and England were to have access to Bison's information and technology, with Goddard and England only having access to the data because Kessler and Goddard had fraudulently induced Bison to enter into the Profit and Salary Understanding. England was subject to confidentiality agreement with Axiom.

129.   Bison invested a substantial amount of time, money, and other resources to develop its confidential information, which information is valuable and provides a demonstrable competitive advantage.

130.   Bison advised Kessler and Goddard of the categories of information that Bison considered to be confidential and that such information was required to be protected from improper use or disclosure.

131.   As alleged herein, and in violation of the law, Kessler and Goddard misappropriated and wrongly disclosed and used Bison's confidential information obtained through their confidential and fiduciary relationship with Bison for their own benefit, for the benefit of Walleye, and to Bison's detriment.

132.   In violation of common law, Walleye obtained Bison's confidential information from individuals, namely Kessler and Goddard, who were under obligations with Bison to maintain and protect the confidentiality of the information. Kessler and

34

Goddard were, at the time of the disclosure to Walleye, members of Bison and subject to the Bison Operating Agreement.

133. Defendants used and continue to use Bison's confidential information for the benefit of themselves and Walleye and to Bison's detriment.

134. At the time Kessler and Goddard misappropriated Bison's confidential information, they were acting as agents of Walleye, which was acting as the principal. In addition, at all relevant times, Kessler has owned and controlled Walleye.

135. Walleye accepted the benefits of Kessler and Goddard's misappropriation of Bison's confidential information.

136. Walleye is, therefore, vicariously liable for Kessler and Goddard's misappropriation of Bison's confidential information.

137. As a direct and proximate cause of Defendants' malicious and willful misappropriation of Bison's confidential information, Bison has and is continuing to suffer immediate and irreparable harm, and will continue to suffer such harm unless and until Defendants are enjoined from further acts constituting misappropriation or from profiting from their past misappropriation.

138. As a further direct and proximate cause of Defendants' malicious and willful misappropriation of Bison's confidential information, Bison has suffered and will continue to suffer damages in an amount that exceeds $75,000 but is not presently ascertainable.

**COUNT IX**
**(Trade Secret Misappropriation under the Minnesota**
**Uniform Trade Secrets Act against all Defendants)**

139.   Bison incorporates by reference the allegations contained in Paragraphs 1-138.

140.   As Defendants acknowledged, Bison's "systems, codes, methods, pricing strategies, procedures, software programs, and any other information which is unique to the Company or which derives independent economic value from not being generally know or readily ascertainable by proper means" are confidential. (Exhibit 1 at §6.4(c).)

141.   The information and technology Bison utilizes in connection with its pairs trading, constitutes its methods, pricing strategies, procedures, and is not generally known or readily ascertainable and constitutes Bison's trade secrets.

142.   The information and technology Bison utilizes in connection with its pairs trading has tremendous economic value.  Indeed, without its pairs trading information and technology, Bison would lose the advantages it has over its competitors, including Walleye, in terms of when to place trades and speed of execution.

143.   Bison has endeavored to keep its pairs trading information and technology secret, including by requiring members of Bison to sign the Noncompete Covenant and by limiting the access that various employees have to the information and technology. Indeed, prior to September 2013, only Gildor, C. Murphy, Wu, K. Murphy, Kessler, and Goddard had access to the information and technology.  After the Profit and Salary Understanding, the same persons and England were to have access to Bison's information and technology, with Goddard and England only having access to the data because

36

Kessler and Goddard had fraudulently induced Bison to enter into the Profit and Salary Understanding.

144.   Nevertheless, Bison's proprietary and confidential information, technology, and trade secrets have been wrongfully used by Walleye and the other Defendants in Walleye's pairs trading operation.

145.   As a direct and proximate cause of Defendants' malicious and willful misappropriation of Bison's trade secrets, Bison has and is continuing to suffer immediate and irreparable harm, and will continue to suffer such harm unless and until Defendants are enjoined from further acts constituting misappropriation or from profiting from their past misappropriation.

146.   As a further direct and proximate cause of Defendants' malicious and willful misappropriation of Bison's trade secrets, Bison has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but exceeds $75,000.

**COUNT X**
**(Breach of Contract Against Walleye:**
**Agreement Requiring Walleye to Execute and Fund Bison's Trades)**

147.   Bison incorporates by reference the allegations contained in Paragraphs 1-146.

148.   A contract existed between Bison and Walleye whereby Walleye agreed to—and did—execute and fund Bison's above-described trading strategies in exchange for Bison's agreement to pay agreed-upon and valuable consideration.

149. Bison performed its obligations under the parties' agreement, and pursuant to the contract, Bison gave Walleye the agreed-upon compensation in consideration of Walleye's agreement to, and acts of, executing and funding Bison's trades.

150. Because the contract did not have a definitive duration, Walleye was required to provide reasonable advance notice to Bison before terminating this agreement.

151. Defendants' August 5, 2014 notice to terminate the funding and effectuating of Walleye's trading as of the close of business on October 31, 2014, was not reasonable under the circumstances, especially due to the complicated nature of the trading transactions that were required to be transitioned from Walleye and Defendants' refusal to timely provide Bison with Bison's data, database, and code that would have enabled Bison to transition the funding and execution of its trades to someone other than Walleye.

152. As described above, Walleye intentionally and deliberately failed to provide such reasonable notice and, instead, terminated the contract in a manner that has materially advantaged Defendants and caused Bison to suffer damages. Specifically, as a direct and proximate cause of the conduct by Walleye, Bison could not execute its trading strategies and lost reasonably foreseeable profits on its trading activity when Bison was forced to shut-down its trading activity on or about November 7, 2014.

153. Defendants have continued to fund and trade its competitive, pairs-trading, high average daily turn-over strategies and, on information and belief, Defendants have made a profit on such trading activity.

154.    As a direct and proximate cause of the breach of contract by Walleye, Bison has suffered damages and will continue to suffer damages, and Walleye has received an improper benefit and will continue to receive an improper benefit, all in amounts that are not presently ascertainable, but exceed $75,000.

## COUNT XI
### (Promissory Estoppel Against Walleye)

155.    Bison incorporates by reference the allegations contained in Paragraphs 1-154.

156.    Walleye made a clear and definite promise to Bison in August 5, 2014, that Walleye would, in good faith, provide a smooth transition from the parties' long-standing agreement and practice whereby Walleye funded and executed Bison's trading strategies in exchange for Bison's agreement to pay the agreed-upon compensation.

157.    Given the parties' long-standing relationship, the parties understood that this meant that Walleye needed to promptly provide Bison with the information necessary to allow Bison or a third party to be able to execute Bison's trading strategies.

158.    At the time the promise was made, Bison and Walleye had worked together for approximately three years and the respective members in Bison and Walleye had had a long-standing fiduciary and contractual relationship with each other.

159.    Bison reasonably relied on Walleye's promise to its detriment; Bison could not begin executing its trading strategies when Walleye stopped doing so.

160.    It is necessary to enforce Walleye's promise to Bison to prevent an injustice from occurring.    Defendants knew that by not timely providing Bison with its data,

39

database and code, Bison would not be able to execute and fund its trading strategies at the time that Walleye ceased providing such services, and for many months thereafter. During the time that Bison has been unable to execute its trading strategies, Walleye—as a competitor that is using Bison's confidential and proprietary models and information—has unfairly benefitted from the absence of Bison from the market.

161.   As a direct and proximate cause of this improper conduct, Bison has suffered damages in the form of lost profits and diminution in value and Walleye has received an improper benefit and will continue to receive an improper benefit, all in amounts that are not presently ascertainable, but exceed $75,000.

## COUNT XII
### (Tortious Interference of Contract Against Kessler and Goddard)

162.   Bison incorporates by reference the allegations contained in Paragraphs 1-161.

163.   As described above, Bison had a contract with Walleye whereby in exchange for Bison's agreement to pay a percentage of its profits to Walleye, Walleye agreed to fund and execute Bison's trades.

164.   Defendants Kessler and Goddard knew of this contract.

165.   Defendants Kessler and Goddard intentionally procured the breach of the contract by causing Walleye to provide unreasonable notice, under the circumstances, to Bison that Walleye was terminating its funding and execution of Bison's trades.

166. Despite knowing of it needed to promptly turnover to Bison the Bison data, database, and code and despite Bison's repeated requests for such information, Defendants Kessler and Goddard refused to allow Walleye to provide the information.

167. Defendants Kessler and Goddard knew that Bison needed such information in order to be able to continue to fund and execute its trading strategies after Walleye ceased doing so.

168. Under these circumstances and with specific notice from Bison, Defendants Kessler and Goddard knew that the November 7, 2014 termination date was unreasonable and that Bison had no ability to continue to execute its trading strategies as of that date.

169. Defendants Kessler and Goddard had no justification for preventing Walleye from promptly providing to Bison, or for causing Walleye to withhold from Bison, the Bison data, database, and code.

170. As a direct and proximate cause of Defendants Kessler and Goddard's tortious interference, Bison has suffered damages, including lost profits and diminution in value from not being able to continue its trading strategies and incurring attorneys' fees and related costs, in an amount that is not presently ascertainable, but that exceeds $75,000.

**WHEREFORE**, Plaintiffs pray that this Court enter judgment in its favor and against the Defendants as follows:

1. Enjoining Defendants from further violating Section 6.4 of the Bison Operating Agreement, including the Noncompete Covenant, Confidential Information Covenant, and other provisions in the Bison Operating Agreement.

2.      Enjoining Defendants from maintaining, using, or disclosing the confidential and proprietary information and trade secrets of Plaintiffs.

3.      Ordering Defendants to return to Plaintiffs all of Plaintiffs' proprietary and confidential information and trade secrets in whatever form, including but not limited to, any documents, copies of documents, notes, electronically or digitally stored information, or any other material in Defendants' custody or control.

4.      Awarding Plaintiffs damages in an amount greater than $75,000.00 against Defendants, jointly and severally.

5.      Awarding Bison exemplary damages pursuant to Minn. Stat. § 325C.03 against Defendants, jointly and severally.

6.      Awarding Plaintiffs its attorneys' fees, expert and consultant fees, and other expenses incurred as a result of Defendants' improper actions against Defendants, jointly and severally, as allowed by applicable law, including but not limited to Minn. Stat. § 325C.04, Minn. Stat. § 322B.38 and Minn. Stat. § 322B.833.

7.      Awarding Plaintiffs pre- and post-judgment interest, costs, and disbursements as permitted by law against Defendants, jointly and severally.

8.      Awarding Plaintiffs all other relief, legal and equitable, that the Court deems just and equitable.

Date:  March 6, 2015                    **OPPENHEIMER WOLFF & DONNELLY LLP**


By:    *s/ Jeffrey J. Bouslog*
      Jeffrey J. Bouslog    (#174671)
      Kathy S. Kimmel    (#268823)
      Cynthia S. Topel    (#389122)
Campbell Mithun Tower – Suite 2000
222 South Ninth Street
Minneapolis, Minnesota  55402-3338
Telephone:    (612) 607-7000
Email:        jbouslog@oppenheimer.com
        kkimmel@oppenheimer.com
        ctopel@oppenheimer.com


and

Gerald D. Hosier, admitted *pro hac vice*
LAW OFFICES OF GERALD D. HOSIER LTD.
2020 Red Mountain Road
Aspen, CO 81611
Telephone:    (970) 948-8823
Email:        wizard@ozpd.com

And

Raymond P. Niro, admitted *pro hac vice*
Paul K. Vickrey, admitted *pro hac vice*
Brian E. Haan, admitted *pro hac vice*
Ashley E. LaValley, admitted *pro hac vice*
Gina K. Kim, admitted *pro hac vice*
NIRO, HALLER & NIRO, LTD.
181 West Madison, Suite 4600
Chicago, IL 60602
Telephone:    (312) 236-0733
Email:        rniro@nshn.com
        vickrey@nshn.com
        bhaan@nshn.com
        alavalley@nshn.com
        gkim@nshn.com

**ATTORNEYS FOR PLAINTIFFS AND
COUNTERCLAIM DEFENDANTS**

43