UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 14-3121(DSD/SER)

Bison Advisors LLC,
Ephraim Gildor and
Argos Capital Management, Inc.

Plaintiffs,

v.                                                      **ORDER**

Irvin Kessler,
Peter Goddard and Walleye
Trading Advisors LLC,

Defendants.


Jeffrey J. Bouslog, Esq. and Kathy S. Kimmel, Esq. and Fox
Rothschild LLP, 222 South Ninth Street, Suite 2000,
Minneapolis, MN 55402, counsel for plaintiffs.

William Z. Pentelovitch, Esq. and Haley N. Schaffer, Esq. and
Maslon LLP, 90 South 7th Street, Suite 3300, Minneapolis, MN
55402, counsel for defendants.


This matter is before the court upon the motions for summary

judgment and to exclude expert testimony by defendants and the

motion for partial summary judgment by plaintiffs. Based on a

review of the file, record, and proceedings herein, and for the

following reasons, the court grants in part defendants' motion for

summary judgment, denies defendants' motions to exclude expert

testimony, and denies plaintiffs' motion for partial summary

judgment.

## BACKGROUND

This dispute arises out of the dissolution of the parties' business relationship.  The case is contentious and complex.  The court will recite only those facts relevant to plaintiffs' misappropriation of trade secrets and confidential information claims, which are the only claims on which summary judgment is warranted.

Defendant Irvin Kessler, defendant Peter Goddard, and three others formed defendant Walleye Trading Advisors LLC in 2005, to engage in electronic trading.[1]  Kessler had been manually "pairs trading" since 1997 through Deephaven Capital Management, its successor company Provident Trading Advisors, and ultimately Walleye.  Pairs trading involves tracking the prices of two historically correlated equities.  When the prices diverge, a trader buys the underperforming equity and sells the overperforming equity, betting on a return to the historical correlation.  Second Am. Compl. ¶ 45.

Kessler wanted to develop a fully automated, algorithmic trading system to overcome the limitations in manual pairs trading and to allow a higher volume of trades, but recognized that Walleye did not have the resources to do so.  In 2010, Kessler approached

---

[1]    The partners also formed a registered broker-dealer, Walleye Trading LLC, to engage in proprietary trading; a private investment fund, Walleye Investments Fund LLC, that trades solely for its own account; and Walleye Software, LLC, to develop trading software.

his former business partner, plaintiff Ephraim Gildor, and proposed collaborating for that purpose.   Gildor agreed and the parties formed plaintiff Bison Advisors LLC.

Kessler enlisted Dr. Kevin Murphy to lead the project at Bison.[2]  Bison's original members were Kessler; Goddard; two other Walleye members; Axiom; Dr. Murphy; Gildor; and two other Axiom members: Dr. Lingling Wu, whom Gildor had hired upon her receiving a PhD in 2001; and Chris Murphy.[3]  Each member signed the Bison Operating Agreement, which included non-compete and confidentiality provisions.  Kimmel Decl. Ex. 1 §§ 6.4(a)(i), 6.4(c).

Thereafter, Walleye and Bison worked closely together for the benefit of both companies.   Aside from the non-compete and confidentiality provisions applicable to the signatories to the Bison Operating Agreement, it does not appear that either Bison or Walleye took additional measures to safeguard the propriety of their mutual work, at least vis-à-vis one another.[4]  To the contrary, it appears that the companies routinely shared and tested each other's data.

---

[2]  Dr. Murphy was Gildor's partner in a foreign currency fund, Axiom Investment Advisors, LLC.

[3]  Bison's ownership structure changed over time.  The court will not address the changes except as necessary.

[4]   There is some evidence that certain Walleye employees signed confidentiality agreements, but the record does not support a finding that all Walleye employees were required to do so.

Dr. Murphy led Chris Murphy and Wu in developing the algorithmic models for an automated equity pairs trading system. To assist in the endeavor, Kessler provided Dr. Murphy and his team with five years of trading data from Kessler's pairs traders and explained his pairs trading strategy to them. <u>See</u> Kessler Decl. ¶ 36; Goddard Decl. ¶¶ 13, 16. Dr. Murphy used Kessler's pairs trading data and ideas in developing Bison's pairs trading system.

Bison began trading in June 2011. Goddard Decl. ¶ 23. Every night, Bison electronically transmitted to Walleye a password protected file with the parameters generated by Bison's algorithms for each trade. Third Goddard Decl. ¶ 16; Kessler Decl. ¶ 40. Walleye Trading would automatically execute the trades the following day. <u>Id.</u> In doing so, Walleye Trading used source code written by Walleye Software employees, using Walleye Software's equipment and resources, and the coders' own knowledge, skills, and experience. Third Goddard Decl. ¶ 17; Kessler Decl. ¶ 39; Goddard Dep. at 85:2-16.

In September 2011, Goddard and Gildor agreed that Bison successfully "[c]reate[d] a pair trading strategy that mimics Kessler's historic pairs-trading (group) experience." <u>Id.</u> Ex. 54 at 1. Goddard noted that having "[Walleye] running in parallel" would help Bison, and Gildor did not disagree. <u>Id.</u> In fact, it appears that Goddard and Kessler regularly provided Bison data about Walleye's pairs trading to improve Bison. <u>See</u> Goddard Decl.

4

¶¶ 25-30, 34-35, 37-39; Kessler Decl. ¶ 43; <u>see also, e.g.</u>, Love Decl. Exs. 19, 24, 29, 52-53, 55-57, 88, 91, 95-96.  Bison became profitable in the spring of 2012 and began to outperform Walleye. Goddard Decl. ¶¶ 31-33; Murphy Dep. at 448:7-449:17.

In March 2012, Kessler and Goddard provided Bison[5] with a file containing all of the transactions from certain Walleye traders from January 2010 through February 2012.  Goddard Decl. ¶ 37; Murphy Dep. at 411:9-412:22, 468:9-470:1.  Bison studied the data and began trying to emulate Walleye's best pair selectors.  Gildor Dep. at 215:1-25; <u>see also</u> Murphy Dep. at 496:5-497:22.  Bison also ran Walleye's trades through its simulator to see how they would perform if traded using Bison's algorithms.  Murphy Dep. at 497:14-18.

According to Bison, in late 2012, Walleye began copying Bison's trading methodology and strategy with great success, but without Bison's knowledge.  Bison alleges that its performance declined commensurately.  Walleye seems to acknowledge that it adopted Bison's trading method, but denies copying Bison's data or the parameters Bison used in making trades.  Indeed, it appears undisputed that Walleye traders used their individual judgment in making trades, whereas Bison trades were fully automated.  <u>See,</u>

---

[5]  Specifically, Goodard and Kessler provided the data to Dr. Murphy and his team who were developing the trading system on behalf of Bison.  The court will refer to Dr. Murphy and his team as "Bison" where appropriate.

<u>e.g.</u>, Second Supp. Rectenwald Decl. ¶¶ 3-8; Second Supp. Mickiewicz Decl. ¶¶ 4-16; Second Supp. Klammer Decl. ¶¶ 4-9.   Nor does the record support a finding that Walleye's traders were privy to the actual trades made by Bison.   <u>See generally</u> <u>id.</u>

In the fall of 2013, for reasons not relevant to plaintiffs' trade secrets claim, Goddard and Kessler withdrew as Bison members but continued to participate in the business.   <u>See, e.g.</u>, C. Murphy Dep. at 8:3-9:4; Love Decl. Ex. 36; Goddard Decl. ¶¶ 52-53.   Dr. Murphy and Wu became Walleye Software employees, but also continued to work, essentially, for Bison.   <u>Id.</u>   The parties appear to have agreed that they would each own "any intellectual property that is mutually used or developed."   <u>See</u> Love Decl. Ex. 36 at 1-2; Kessler Decl. ¶ 55.

In March 2014, Kessler told Gildor and Dr. Murphy he believed Bison pairs needed a full-time manager to help improve its performance.   Gildor agreed to have William England, a Walleye employee, and Chris Murphy co-manage Bison's trading.   Kessler Decl. ¶ 55.

In May 2014, Gildor claims that he learned, for the first time, that Walleye was using Bison's strategy in pairs trading. The parties' relationship declined thereafter and this suit followed.

On August 7, 2014, Bison filed suit, alleging various contract, tort, and statutory claims, including a claim under the

Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01-08.
Plaintiffs amended the complaint twice, and defendants responded
with numerous counterclaims.  After lengthy discovery and extensive
non-dispositive motion practice, defendants now move for summary
judgment and for the exclusion of plaintiffs' expert witnesses, and
plaintiffs move for partial summary judgment.


### DISCUSSION

I.   **Summary Judgment**

    **A. Standard**

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
A fact is material only when its resolution affects the outcome of
the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  A dispute is genuine if the evidence is such that it could
cause a reasonable jury to return a verdict for either party.  See
id. at 252.

On a motion for summary judgment, the court views all evidence
and inferences in a light most favorable to the nonmoving party.
Id. at 255.  The nonmoving party, however, may not rest upon mere
denials or allegations in the pleadings but must set forth specific
facts sufficient to raise a genuine issue for trial.  Celotex, 477

U.S. at 324.  A party asserting that a genuine dispute exists – or cannot exist – about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

### B.   Trade Secrets Claim

Plaintiffs assert that defendants misappropriated Bison's trade secrets in violation of the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-08.  Defendants argue that plaintiffs' misappropriation claim fails because the alleged trade secrets are generally known and readily ascertainable by lawful means or, in the alternative, because plaintiffs did not take reasonable efforts to maintain the secrecy of the alleged trade secret information.[6]

The act protects certain types of information through an action for misappropriation.  Under the act, misappropriation is defined as the improper acquisition, disclosure, or use of a "trade secret."  Minn. Stat. § 325C.01, subdiv. 3.  The court analyzes the following three factors to determine whether a particular item constitutes a trade secret:

---

[6]   Defendants also argue that plaintiffs have not shown misappropriation of the alleged trade secrets.  The court does not reach this issue but is dubious that misappropriation occurred given the parties' relationship.

(1) The information must not be generally known or readily ascertainable;

(2) The information must derive independent economic value from secrecy; and

(3) The party asserting misappropriation must have made reasonable efforts to maintain the secrecy of the item.

Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 899–901 (Minn. 1983); Gordon Emp't, Inc. v. Jewell, 356 N.W.2d 738, 741 (Minn. Ct. App. 1984).   The party asserting misappropriation must establish each factor to sustain the claim.   See e.g., Electro-Craft, 332 N.W.2d at 899–902; RING Comput. Sys., Inc. v. ParaData Comput. Networks, Inc., No. C4-90-889, 1990 WL 132615, at *2 (Minn. Ct. App. Sept. 18, 1990).

The court finds that plaintiffs' misappropriation claim is without merit.  Even if plaintiffs were able to establish the first two factors set forth above, determinations the court need not make in this case,[7] their misappropriation claim fails because they proffer insufficient evidence demonstrating that they maintained reasonable efforts to ensure the secrecy of the alleged trade secrets.

_____

[7] The court notes that plaintiffs allege the existence of 18 trade secrets.  Neither party briefed the merits of each alleged trade secret, so the court is unable to determine whether they meet the first two factors.  The third factor, however, applies equally to all of the alleged trade secrets because it turns on plaintiffs' conduct rather than the nature of the data.

Plaintiffs submit no evidence of the steps it took to maintain confidentiality, beyond the fact that defendants signed the Bison Operating Agreement, which includes non-compete and confidentiality provisions.   The law is clear that the mere existence of a confidentiality agreement is insufficient to establish that the covered information is a trade secret.   See Coyne's & Co. v. Enesco, LLC, No. 07-4095, 2010 WL 3269977, at *16 (D. Minn. Aug. 16, 2010) (rejecting trade secret claim, in part, because plaintiff failed to establish that it took measures beyond a non-disclosure agreement to maintain the confidentiality of the information); Electro-Craft, 332 N.W.2d at 901-02 (concluding that plaintiff undertook insufficient effort to maintain secrecy even though it screened handbooks and publication for confidential information and required key employees to sign a confidentiality agreement); RING Comput. Sys., 1990 WL 132615, at *2 (holding that "signing of a confidentiality agreement, without more, is not enough").

Further, there is no evidence that each of the Walleye employees who worked with the Bison data, and who were not signatories to the Bison Operating Agreement, signed a confidentiality agreement with respect to that data.   See Gordon Emp't, 356 N.W.2d at 741 (holding that a lack of policy on confidentiality and lack of discussions between the employer and employee concerning confidentiality supports the finding that no secrecy was maintained).   In fact, as set forth above, Bison and

Walleye appear to have freely traded the data without restriction.[8] Plaintiffs' efforts were especially inadequate given the nature of the alleged trade secrets and the intertwined relationship between Bison and Walleye and their employees.

Although plaintiffs contend that they expected that the information would be kept private, more than an expectation of secrecy is required — plaintiffs must show that they manifested such an intention by making some effort to keep the information secret. Jostens, Inc. v. Nat'l Comput. Sys., Inc., 318 N.W.2d 691, 700 (Minn. 1982); Cherne Indus., Inc. v. Grounds & Assoc., 278 N.W.2d 81, 91 (Minn. 1979). Given the parties' relationship and course of conduct, no reasonable jury could conclude that plaintiffs took sufficient measures to ensure the secrecy of the data at issue. Accordingly, the court finds that plaintiffs fail to raise a genuine dispute concerning their efforts to maintain the secrecy of Bison's alleged trade secrets.

Plaintiffs' common law claim for misappropriation of confidential information also fails because they have not established that the information underlying that claim is distinct from the information underlying their trade secrets claim. See Mayo Clinic v. Elkin, No. 09-322, 2010 WL 760728, at *5 n.13 (D. Minn. March 4, 2010) ("Under the MUTSA's displacement provision, a

---

[8] The fact that some of the data may have been password protected is also insufficient to establish trade secret status because the data was still shared freely.

plaintiff may only maintain separate causes of action 'to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets.'") (citation omitted).

Summary judgment, therefore, is warranted as to plaintiffs' misappropriation of trade secrets and confidential information claims.  As to the remaining claims, genuine issues of material fact preclude summary judgment.

## II. **<u>Daubert</u> Motions**

Defendants move to exclude the testimony of plaintiffs' expert witnesses Israel Nelken, William Goetzmann, and Frank Bernatowicz under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Because Nelken and Goetzmann opine as to the viability of plaintiffs' now-dismissed trade secrets claim, the motions to exclude their testimony are denied as moot.

Defendants' arguments with respect to Bernatowicz go to the weight of his testimony, not to the admissibility of his opinion under <u>Daubert</u>.  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>Children's Broad. Corp. v. Walt Disney Co.</u>, 357 F.3d 860, 865 (8th Cir. 2004) (citations and internal quotation marks omitted).  The court is satisfied that Bernatowicz's proposed testimony does not rise to the level of "fundamentally unsupported." Moreover, at trial, defendants will

have the opportunity to cross-examine him, and it is "within the province of the jury to evaluate issues of fact and credibility." Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006). Defendants' motion as to Bernatowicz is denied without prejudice subject to objections at trial.

### CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.   Defendants' motion for summary judgment [ECF No. 280] is granted in part as set forth above;

2.   Defendants' motions to exclude expert testimony of Israel Nelken and William Goetzmann [ECF Nos. 281 and 282] are denied as moot;

3.   Defendants' motion to exclude expert testimony of Frank Bernatowicz [ECF No. 283] is denied without prejudice; and

4.   Plaintiffs' motion for partial summary judgment [ECF No. 284] is denied.


Dated: August 12, 2016

                              s/David S. Doty
                              David S. Doty, Judge
                              United States District Court

13